IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE FUND<br>257 Park Avenue South<br>New York, NY 10010<br><br>CENTER FOR BIOLOGICAL<br>  DIVERSITY<br>378 North Main Avenue<br>Tucson, AZ 85701<br><br>CONSERVATION LAW FOUNDATION<br>62 Summer Street<br>Boston, MA 02110<br><br>ENVIRONMENT AMERICA<br>1543 Wazee Street, Suite 410<br>Denver, CO 80202<br><br>ENVIRONMENTAL LAW & POLICY<br>  CENTER<br>35 E Wacker Drive, Suite 1600<br>Chicago, IL 60601<br><br>NATURAL RESOURCES DEFENSE<br>  COUNCIL, INC.<br>40 West 20th Street, 11th Floor<br>New York, NY 10011<br><br>PUBLIC CITIZEN, INC.<br>1600 20th Street NW<br>Washington, DC 20009<br><br>SIERRA CLUB<br>2101 Webster Street, Suite 1300<br>Oakland, CA 94612<br><br>UNION OF CONCERNED SCIENTISTS<br>Two Brattle Square<br>Cambridge, MA 02138<br><br>*Plaintiffs*,<br><br>v. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Civil Action No. 1:19-cv-2907 |

ELAINE L. CHAO, in her official capacity as )
  Secretary of the United States Department )
  of Transportation )
1200 New Jersey Avenue SE )
Washington, DC 20590 )
  )
JAMES C. OWENS, in his official capacity as )
  Acting Administrator of the National )
  Highway Traffic Safety Administration )
1200 New Jersey Avenue SE )
Washington, DC 20590 )
  )
UNITED STATES DEPARTMENT OF )
  TRANSPORTATION )
1200 New Jersey Avenue SE )
Washington, DC 20590 )
  )
NATIONAL HIGHWAY TRAFFIC )
  SAFETY ADMINISTRATION )
1200 New Jersey Avenue SE )
Washington, DC 20590 )
  )
UNITED STATES OF AMERICA )
c/o United States Department of Justice )
950 Pennsylvania Avenue NW )
Washington, DC 20530 )
  )
  )
           *Defendants.* )

# COMPLAINT

Plaintiffs are public-interest organizations that respectfully ask this Court to declare unlawful and set aside regulations of the National Highway Traffic Safety Administration (NHTSA) respecting preemption under the Energy Policy and Conservation Act of 1975, Pub. L. No. 94-163, 89 Stat. 871 (EPCA). The regulations (collectively, the Preemption Rule) are to be codified at 49 C.F.R. parts 531 and 533 and appendices thereto. United States Environmental Protection Agency (EPA) & NHTSA, *The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program*, 84 Fed. Reg. 51,310, 51,361–63 (Sept. 27, 2019) (Final Rule) (Exhibit A). The Preemption Rule exceeds NHTSA's statutory authority; it is arbitrary, capricious, an abuse of discretion, contrary to law, and unwarranted by the

facts; and it issued without observance of procedures required by the National Environmental Policy Act, Pub. L. No. 91-190, 83 Stat. 852 (1970) (NEPA).

## I.      Jurisdiction and Venue

1. Counts I, II, and III arise under the Administrative Procedure Act (APA), Pub. L. No. 79-404, § 10, 60 Stat. 237, 243 (1946), *codified as amended at* 5 U.S.C. §§ 701–706. Count IV presents a non-statutory claim that invokes this Court's inherent authority to review *ultra vires* federal actions.

2. Federal district courts have subject-matter jurisdiction over APA and non-statutory claims pursuant to 28 U.S.C. § 1331 and the waiver of federal sovereign immunity in 5 U.S.C. § 702.

3. Venue is proper in this Court under 28 U.S.C. § 1391(b) and (e).

## II.      Parties

### A. Plaintiffs

4. Center for Biological Diversity is a national, nonprofit conservation organization with approximately 67,000 members and more than 1.6 million supporters across the United States dedicated to the protection of endangered species and the environment. Through science, law and creative media, the Center focuses on protecting the lands, waters, air, and climate that all living species need to survive. The Center's Climate Law Institute, in particular, works to protect people, wildlife and ecosystems from climate change and fossil-fuel pollution, and to eliminate greenhouse gas (GHG) pollution and speed the just transition to 100 percent clean, renewable energy. The Center is incorporated under the laws of the State of Arizona and headquartered in Tucson, with other major offices in Washington, D.C., and several other cities throughout the United States.

5. Conservation Law Foundation (CLF) is a nonprofit, member-supported environmental organization whose vision is a healthy, thriving New England – for generations to come. Founded in 1966, CLF uses the law, science and the market to create solutions that preserve our natural resources,

build healthy communities, and sustain a vibrant economy. CLF is incorporated in the Commonwealth of Massachusetts with offices in Massachusetts, Maine, New Hampshire, Vermont, and Rhode Island.

6. Environment America is a nonprofit organization with hundreds of thousands of members nationwide. Environment America works for clean air, clean water, clean energy, wildlife and open spaces, and a livable climate. Through its Clean Car Communities campaign, Environment America is working, particularly at the state and local level, to reduce the vehicle pollution that contributes to global warming and endangers public health. Environment America is a tax-exempt organization incorporated under the laws of the state of Colorado, with headquarters in Denver, Colorado, and a federal advocacy office in Washington, D.C.

7. Environmental Defense Fund (EDF) is a nonprofit organization with more than two million members and supporters. Established in 1967, EDF seeks to solve some of the most critical environmental problems facing humanity, including climate change, pollution, and exposure to toxic chemicals, and to educate the public about these problems. As part of its efforts to reduce pollution by advancing cleaner and zero-emission vehicles, EDF engaged in regulatory proceedings related to the state laws that the Preemption Rule declares invalid. EDF is incorporated under the laws of the State of New York, with headquarters in New York City and offices in Washington, D.C. and seven other cities across the United States.

8. Environmental Law & Policy Center (ELPC) is a nonprofit membership organization and the Midwest's leading public interest environmental legal advocacy and eco-business innovation organization. ELPC works to improve public health and to protect our natural resources across the Great Lakes states and the Midwest region. ELPC is incorporated under the laws of the State of Illinois with offices in Illinois, Iowa, Michigan, Minnesota, Ohio, Wisconsin, and Washington, D.C.

9. Natural Resources Defense Council, Inc. (NRDC) is a nonprofit environmental and public-health membership organization with hundreds of thousands of members. NRDC engages in research,

advocacy, public education, and litigation to protect public health and the environment. Since its founding in 1970, NRDC has worked to reduce air pollution and improve air quality throughout the United States. As part of this work, NRDC has advocated for laws and policies at the state and federal levels that reduce emissions from the transportation sector by providing consumers with cleaner vehicles. NRDC is a tax-exempt organization incorporated under the laws of the State of New York, with headquarters in New York City.

10. Public Citizen, Inc., is a national, nonprofit consumer advocacy organization with more than 400,000 members and supporters nationwide. Public Citizen engages in research, advocacy, media activity, and litigation related to advancing health and safety, consumer protection, and the environment, among other things. In particular, Public Citizen has a long history of advocacy to advance its members' interests in the availability in the marketplace of safe, clean, economical, and reliable automobiles, and Public Citizen's members rely on it to advocate on their behalf with respect to protection of those interests. Public Citizen participates in regulatory proceedings, litigates, conducts research, and publishes reports directed to that end, and has supported both federal and state measures to protect against automotive GHG emissions. Public Citizen is incorporated in the District of Columbia and has its principal offices in Washington, D.C., as well as an office in Austin, Texas.

11. Sierra Club is the nation's oldest and largest grassroots environmental organization, with hundreds of thousands of members. Sierra Club's mission is to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's resources and ecosystems; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives. For decades, Sierra Club has used the traditional tools of advocacy—organizing, lobbying, litigation, and public outreach—to support policies that seek to reduce emissions of pollution that harms public health and the environment and to provide consumers with clean vehicles. As part of these efforts, Sierra Club has participated in

proceedings related to state laws and regulations that the Preemption Rule declares invalid. Sierra Club is incorporated under the laws of the State of California, with its principal place of business in Oakland, California.

12. Union of Concerned Scientists (UCS) is a nonprofit organization with a half million members and more than 25,000 scientists and technical experts across the nation. UCS puts rigorous, independent science to work to solve our planet's most pressing problems by combining technical analysis and effective advocacy to create innovative, practical solutions for a healthy, safe, and sustainable future. The UCS Clean Transportation Program, begun in 1990, seeks to reduce oil consumption, GHG emissions, and air pollution from the transportation sector, and to increase equitable access to clean, affordable transportation for communities across the nation.

**B. Defendants**

13. The United States Department of Transportation is an authority of the Government of the United States and is headquartered in Washington, D.C.

14. Elaine L. Chao is the Secretary of Transportation. Ms. Chao is the highest-ranking official of the United States Department of Transportation, and she is sued in her official capacity.

15. NHTSA is "an administration in the [United States] Department of Transportation," 49 U.S.C. § 105(a), and is headquartered in Washington, D.C.

16. James C. Owens is NHTSA's Acting Administrator. Mr. Owens is the highest-ranking official of NHTSA, *see* 49 C.F.R. § 501.4(a), and he is sued in his official capacity.

17. The United States Department of Transportation and NHTSA are "agencies" within the meaning of 5 U.S.C. § 551(1). In this complaint, the term "NHTSA" refers to both NHTSA and the United States Department of Transportation.

18. The United States of America is named as a party defendant pursuant to 5 U.S.C. § 702.

III.    **Facts**

A.  **Statutory and Regulatory Background**

i.   *Federal Clean Air Legislation and California's Vehicular Emission Standards*

19. The State of California has regulated the emissions of air pollutants from motor vehicles since 1959. *See* 1959 Cal. Stats. ch. 200, § 1. In 1963, Congress enacted the Clean Air Act, Pub L. No. 88-206, 77 Stat. 392 (CAA), which recognized that "air pollution brought about by … motor vehicles[] ha[d] resulted in mounting dangers to the public health and welfare," *id.*, 77 Stat. at 393, *recodified at* 42 U.S.C. § 7401(a)(2), but did not require new federal emission standards. Congress affirmed in the Act that "the prevention and control of air pollution at its source is the primary responsibility of States and local governments." *Id.*, 77 Stat. at 393, *recodified as amended at* 42 U.S.C. § 7401(a)(3).

20. In 1965, Congress amended the CAA to authorize the Secretary of Health, Education, and Welfare to establish "standards, applicable to the emission of any kind of substance, from any … new motor vehicles, which … cause or contribute to, or are likely to cause or contribute to, air pollution which endangers the health or welfare of any persons." Motor Vehicle Air Pollution Control Act, § 202(a), Pub. L. No. 89-272, 79 Stat. 992 (1965), *recodified as amended at* 42 U.S.C. § 7521(a)(1). The Secretary thus was authorized to establish federal standards for vehicular emissions of pollutants including carbon dioxide and other GHGs. *See, e.g.*, S. Rep. 90-403, at 18 (1967) (listing carbon dioxide as a substance that could be regulated under the CAA).

21. The Air Quality Act of 1967, Pub. L. No. 90-148, 81 Stat. 485, amended the CAA to ensure that California, in addition to the federal government, is authorized to regulate vehicular emissions. Congress added a provision to the CAA requiring that the federal government permit California to set and enforce its own standards subject to very limited conditions. The provision first stated that "[n]o State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles." *Id.* § 2, 81 Stat. at 501. But the provision also

required that the federal government waive that preemption for California. Specifically, the provision ordered the Secretary of Health, Education, and Welfare to "waive application of [preemption] to any State which has adopted standards (other than crankcase emission standards) for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966." *Ibid.* California is the only State in the Union that had established, prior to March 30, 1966, standards (other than crankcase emission standards) for control of emissions from new motor vehicles or engines.

22. In 1970, Congress transferred the federal authority under the CAA from the Secretary of Health, Education, and Welfare to the Administrator of the newly created EPA; carried forward the California-waiver provision discussed in paragraph 21, *supra*; and re-designated that provision as Section 209 of the CAA, where it remains in force today. CAA Amendments of 1970, Pub. L. No. 91-604, § 8(a), 84 Stat. 1676, 1694, *recodified as amended at* 42 U.S.C. § 7543. The 1970 amendments substituted the phrase "any air pollutant" for the Air Quality Act's reference to "any kind of substance." *Id.* § 6(a), 84 Stat. at 1690.

23. EPA has granted waivers of preemption authorizing California to adopt and enforce its own state standards for air-pollutant emissions from vehicles of every model year since 1969. By the time EPCA was enacted in December 1975, EPA had issued California a waiver to regulate emissions of air pollutants from light-duty vehicles of model years 1977 and beyond. *California State Motor Vehicle Pollution Control Standards; Waiver of Federal Preemption*, 40 Fed. Reg. 23,102 (May 28, 1975). In 1973, EPA observed that, "[i]n general, Federal [emission] standards … followed California standards by at least 1 full model year. This historical pattern of regulation … permitted manufacturers to scale up their production processes as improved emission control technology [was] developed and employed." *Motor Vehicle Pollution Control Suspension Granted*, 38 Fed. Reg. 10,317, 10,318 (Apr. 26, 1973).

### ii.  *EPCA's Treatment of California's Vehicular Emission Standards*

24. Congress enacted EPCA in the wake of the 1973–74 oil crisis, during which several nations temporarily reduced petroleum production and embargoed petroleum exports to the United States. To fortify the nation against such events, EPCA mandated reductions in domestic consumption of petroleum through, among other things, "improved energy efficiency for motor vehicles." EPCA, § 2(5), 89 Stat. at 874.

25. To this end, EPCA instituted an "average fuel economy standard," which the Act defines as "a performance standard which specifies a minimum level of average fuel economy" that automakers must attain in a model year. EPCA, § 301, 89 Stat. at 902, *recodified as amended at* 49 U.S.C. § 32901(a)(6). This standard is commonly known as the corporate average fuel economy (CAFE) standard.

26. As described in more detail in paragraphs 27–30, *infra*, Congress made express mention in EPCA of federal emission standards and California emission standards for which EPA has granted a waiver of preemption under Section 209(b) of the CAA. Congress ordered NHTSA to accommodate both federal and state emission standards when determining the appropriate CAFE standard.

27. For model years 1978–80, EPCA itself prescribed CAFE standards for passenger vehicles: 18.0, 19.0, and 20.0 miles per gallon, respectively. EPCA, § 301, 89 Stat. at 902. Automakers asserted at that time "that compliance with the California [emission] standards" resulted in "poorer fuel economy." 40 Fed. Reg. at 23,104. Congress thus allowed NHTSA to relax CAFE standards for those model years for individual automakers upon a demonstration that, among other things, California emission standards applicable to the model year at issue (but that had not applied to model year 1975 vehicles) likely would "reduc[e]" that automaker's "average fuel economy." EPCA, § 301, 89 Stat. at 905. The statute classified California emission standards for which EPA had issued a CAA waiver of preemption—*i.e.*, "emissions standards applicable by reason of section 209(b) of [the CAA]"—as

"Federal standards" whose impact on an automaker's average fuel economy might warrant a CAFE adjustment. *Ibid.*

28. For model years 1981–84, Congress required that NHTSA establish generally applicable CAFE standards for passenger vehicles reflecting "maximum feasible fuel economy." EPCA, § 301, 89 Stat. at 903. When determining maximum feasible fuel economy, NHTSA had to consider four factors, including not only "the need of the Nation to conserve energy," "technological feasibility," and "economic practicability," but also "the effect of other Federal motor vehicle standards on fuel economy." *Id.*, 89 Stat. at 905, *recodified as amended at* 49 U.S.C. § 32902(f). When considering this last factor, NHTSA classified California emission standards for which EPA had issued waivers of CAA preemption as Federal motor vehicle standards whose effects the agency had to consider in standard-setting. *See* NHTSA, *Light Truck Fuel Economy Standards for Model Years 1980-1981*, 43 Fed. Reg. 11,995, 12,009–10 (Mar. 23, 1978). NHTSA also considered effects of California emission standards when establishing generally applicable CAFE standards for non-passenger vehicles. *Part 533—Average Fuel Economy Standards for Nonpassenger Automobiles; Final Rule*, 42 Fed. Reg. 13,807, 13,814–15 (Mar. 14, 1977).

29. For passenger vehicles of model years 1985 and later, EPCA set a default CAFE standard of 27.5 miles per gallon but allowed NHTSA to establish a different standard after considering the same four statutory factors, including the effect on fuel economy of other Federal motor vehicle standards. EPCA, § 301, 89 Stat. at 903. When setting CAFE standards for those model years, NHTSA treated California emission standards for which EPA previously had granted waivers of CAA preemption as Federal motor vehicle standards whose effects on fuel economy the agency had to consider. *See, e.g.*, NHTSA, *Light Truck Average Fuel Economy Standards; Model Years 1993-94*, 56 Fed. Reg. 13,773, 13,777–79 (Apr. 4, 1991); NHTSA, *Light Truck Average Fuel Economy Standards; Model Years 1990-91*, 53 Fed. Reg. 11,074, 11,077–78 (Apr. 5, 1988).

30. EPCA further allowed NHTSA to relax CAFE standards for certain small manufacturers of passenger automobiles of model years 1978 and later. EPCA, § 301, 89 Stat. at 903–04. The Act required that any relaxed standard still reflect the "maximum feasible average fuel economy level for the manufacturers to which the standard applies," *id.*, 89 Stat. at 904, and thus required that NHTSA consider the same four factors, including the effects of "other Federal motor vehicle standards," *see id.*, 89 Stat. at 905. NHTSA repeatedly used this small-automaker authority to relax CAFE standards to account for fuel-economy effects of California emission standards. *E.g.*, 49 C.F.R. § 531.5(b) (1983) (relaxing CAFE standards for small automakers whose compliance with "other Federal motor vehicle standards," namely, "the 1983-1985 California emission standard for oxides of nitrogen," "impose[d] a fuel economy penalty," NHTSA, *Passenger Automobile Fuel Economy Standards*, 47 Fed. Reg. 20,639, 20,649 (May 13, 1982) (proposed rule); *see also* NHTSA, *Passenger Automobile Average Fuel Economy Standards*, 47 Fed. Reg. 55,684 (Dec. 13, 1982) (final rule)); 49 C.F.R. § 531.5(b)(1) (1981) (relaxing a CAFE standard for a small automaker whose compliance with "other Federal standards," namely, "the 1980 California emissions standards," led to "a lower average fuel economy," NHTSA, *Passenger Automobile Average Fuel Economy Standards; Proposed Decision to Grant Exemption*, 46 Fed. Reg. 5022, 5024–25 (Jan. 19, 1981) (proposed rule); *see also* NHTSA, *Passenger Automobile Average Fuel Economy Standards; Exemption from Average Fuel Economy Standards*, 46 Fed. Reg. 24,952 (May 4, 1981) (final rule)).

31. In 1978, EPA observed that Congress had "fully addressed the problems associated with technological conflicts between fuel economy and emissions control during its consideration of [EPCA] and intended that such conflicts would be resolved through reconsideration by [NHTSA] of the average fuel economy standard in light of California emission standards." *California State Motor Vehicle Pollution Control Standards; Waiver of Federal Preemption*, 43 Fed. Reg. 1829, 1831 (Jan. 12, 1978).

32. EPCA included a clause preempting any state "law or regulation relating to fuel economy standards or average fuel economy standards applicable to automobiles covered by" a CAFE standard.

EPCA, § 301, 89 Stat. at 914. Congress has twice amended this clause "without substantive change." U.S. Code: Technical Amendments to Transportation Laws, Pub. L. No. 103-429, § 10(a), 108 Stat. 4377, 4391 (1994); Revision of Title 49, U.S. Code Annotated, "Transportation," Pub. L. No. 103-272, § 6(a), 108 Stat. 745, 1378 (1994). EPCA's preemption clause has been recodified at 49 U.S.C. § 32919 and now provides, in relevant part:

> When an average fuel economy standard prescribed under [49 U.S.C. Chapter 329] is in effect, a State or a political subdivision of a State may not adopt or enforce a law or regulation related to fuel economy standards or average fuel economy standards for automobiles covered by an average fuel economy standard under this chapter.

49 U.S.C. § 32919(a). The preemption clause does not mention NHTSA or any other federal agency, nor does the clause mention or envision implementing regulations.

33. In 1994, as part of a general recodification of EPCA, Congress substituted "other motor vehicle standards of the Government" for "other Federal motor vehicle standards" in the statutory provision (first discussed in paragraph 28, *supra*) that specifies the four factors NHTSA must consider when determining "maximum feasible average fuel economy." Revision of Title 49, § 1(e), 108 Stat. at 1060, *codified at* 49 U.S.C. § 32902(f). Congress explained, however, that its 1994 recodification "may not be construed as making a substantive change in the law[]." *Id.* § 6(a), 108 Stat. at 1378.

34. Accordingly, EPCA still requires that NHTSA consider California emission standards for which EPA has granted a waiver of CAA preemption when NHTSA determines maximum feasible average fuel economy and sets CAFE standards. *See, e.g.*, NHTSA, *Average Fuel Economy Standards for Light Trucks Model Years 2008-2011*, 71 Fed. Reg. 17,566, 17,643 (Apr. 6, 2006) (evaluating the effects on average fuel economy of California's "emission requirements under Section 209(b) of [the] CAA," which NHTSA characterized as "Federal Motor Vehicle Emissions Standards" that EPCA required the agency to consider when determining CAFE standards); NHTSA, *Light Truck Average Fuel Economy Standards Model Years 2005-2007*, 68 Fed. Reg. 16,868, 16,895–96 (Apr. 7, 2003) (same).

### iii. Congressional Reaffirmation of California's Vehicular Emission Standards in the Clean Air Act Amendments of 1977

35. Shortly after enacting EPCA, Congress amended Section 209(b) of the CAA to reaffirm and strengthen California's authority to set its own standards for vehicular emissions. *See* CAA Amendments of 1977, Pub. L. No. 95-95, § 207, 91 Stat. 685, 755 (1977). The amendments clarified that an automaker's compliance with state emission standards for which EPA has granted a waiver of preemption "shall be treated as compliance with applicable Federal standards" under the CAA. *Ibid.*, *codified as amended at* 42 U.S.C. § 7543(b)(3).

36. Congress concurrently broadened the role that California standards play in combating air pollution. The CAA Amendments of 1977 authorized any State with an EPA-approved implementation plan for national ambient air quality standards to choose between the vehicular emission standards of California or the federal government. These States may, without EPA's approval, "adopt and enforce for any model year standards relating to control of emissions" that are "identical to the California standards for which a waiver has been granted." Pub. L. No. 95-95, § 129(b), 91 Stat. at 750. This provision is codified at Section 177 of the CAA, 42 U.S.C. § 7507, and a State that chooses to adopt the California standards is known as a "Section 177 State." Congress later clarified that States must choose either federal or California vehicular emission standards: No State may "take any action of any kind to create, or have the effect of creating, a motor vehicle or motor vehicle engine different than a motor vehicle or engine certified in California under California standards (a 'third vehicle')." CAA Amendments of 1990, Pub. L. No. 101-549, § 232, 104 Stat. 2399, 2529, *codified at* 42 U.S.C. § 7507.

37. More than one-third of new light-duty vehicles sold in the United States are sold in California or a Section 177 State that had adopted California vehicular emission standards at the time the Preemption Rule was finalized. California Air Resources Board, Fact Sheet: "States that have Adopted California's Vehicle Standards under Section 177 of the Federal Clean Air Act" (Mar. 18, 2019), *available at* https://ww2.arb.ca.gov/sites/default/files/2019-03/177-states.pdf (last visited Sept. 27, 2019).

### iv.  California's Mandate for Zero-Emission Vehicles (ZEVs)

38. The California Clean Air Act of 1988 directed the California Air Resources Board (CARB) to set vehicular emission standards to "achieve the maximum degree of emission reduction possible." Cal. Health & Safety Code § 43108(a). CARB responded in 1990 with emission standards for carbon monoxide, oxides of nitrogen, nonmethane organic gas, particulate matter, and formaldehyde. *See* 13 Cal. Code Regs. § 1960.1. CARB mandated that, beginning in model year 1998, a small but increasing percentage of an automaker's light-duty fleet that is manufactured for sale in California must be zero-emission vehicles (ZEVs). *Id.* § 1960.1(g)(2) n.9 (1991). ZEVs do not produce any exhaust emissions of air pollutants (or precursors thereto) subject to regulation under the CAA or California law. CARB has amended its ZEV mandate several times but never rescinded it.

39. In 1990, a few months after CARB established a light-duty ZEV mandate, Congress ordered EPA to promulgate regulations defining a ZEV in a manner "conform[ing] as closely as possible to standards which are established by … California for … ZEV vehicles." 42 U.S.C. § 7586(f)(4). EPA thereafter issued regulations adopting CARB's definition of ZEV wholesale. *Emission Standards for Clean-Fuel Vehicles and Engines, Requirements for Clean-Fuel Vehicle Conversions, and California Pilot Test Program*, 59 Fed. Reg. 50,042, 50,050 (Sept. 30, 1994) (codified at 40 C.F.R. § 88.104-94(g)).

40. Beginning in 1993, EPA issued California a series of waivers of CAA preemption for the ZEV mandate and amendments thereto. *E.g.*, *California State Motor Vehicle Pollution Control Standards; Waiver of Federal Preemption*, 58 Fed. Reg. 4166 (Jan. 13, 1993); *California State Motor Vehicle Pollution Control Standards; Notice of Within-the-Scope Determination for Amendments to California's Zero-Emission Vehicle (ZEV) Standards and Notice of Waiver of Federal Preemption Decision for Other ZEV standards*, 71 Fed. Reg. 78,190 (Dec. 28, 2006); *California State Motor Vehicle Pollution Control Standards; Notice of Decision Granting a Waiver of Clean Air Act Preemption for California's Advanced Clean Car Program and a Within the Scope*

*Confirmation for California's Zero Emission Vehicle Amendments for 2017 and Earlier Model Years*, 78 Fed. Reg. 2112 (Jan. 9, 2013) (2013 Waiver).

41. When NHTSA sets a CAFE standard, the agency cannot "consider the fuel economy of" vehicles propelled exclusively by alternative fuel, 49 U.S.C. § 32902(h)(1); *see also id.* § 32901(a)(8); and NHTSA must consider vehicles propelled by a combination of gasoline or diesel fuel and an alternative fuel "to be operated only on gasoline or diesel fuel," *id.* § 32902(h)(2); *see also id.* § 32901(a)(9). A CAFE standard therefore does not reflect NHTSA's judgment of the *actual* "maximum feasible average fuel economy level" attainable by automakers, *id.* § 32902(a), but rather the (artificially low) average fuel economy level that would be the maximum feasible in the counterfactual world in which every vehicle manufactured was propelled exclusively by gasoline or diesel fuel.

### v.  California's GHG-Emission Standards

42. In 2002, the California Legislature directed CARB to "adopt regulations that achieve the maximum feasible and cost-effective reduction of [GHG] emissions from motor vehicles." Cal. Health & Safety Code § 43018.5(a). CARB responded in 2005 by promulgating standards for GHG emissions from light-duty vehicles of model years 2009 and later. *See* 13 Cal. Code Regs. § 1961.1.

43. In April 2007, the U.S. Supreme Court ruled in *Massachusetts v. EPA*, 549 U.S. 497 (2007), that GHGs "unambiguous[ly]" are and have always been "air pollutants" within the meaning of the CAA, *id.* at 529. GHGs, the Court observed, "fit well within the [CAA's] capacious definition of 'air pollutant,'" such "that EPA has the statutory authority to regulate the emission of such gases from new motor vehicles." *Id.* at 532. In so holding, the Court rejected EPA's contention that it "cannot regulate carbon dioxide emissions from motor vehicles because doing so would require it to tighten mileage standards, a job (according to EPA) that Congress has assigned to [NHTSA]." *Id.* at 531–32. The Court reasoned that "EPA has been charged with protecting the public's 'health' and 'welfare,' a statutory obligation wholly independent of [NHTSA's] mandate to promote energy efficiency. The

two obligations may overlap, but there is no reason to think the two [federal] agencies cannot both administer their obligations and yet avoid inconsistency." *Id.* at 532 (citation omitted).

44. In September 2007, the U.S. District Court for the District of Vermont rejected a claim that EPCA expressly or impliedly preempts GHG-emission standards for which EPA issues a waiver of CAA preemption. *Green Mtn. Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295. Regarding express preemption, the court stated, among other things, that "Congress could not have considered an EPA-approved California emission standard to be automatically subject to express preemption as a 'law or regulation relating to fuel economy standards,' because it required that NHTSA take into consideration the effect of such standards when determining maximum feasible average fuel economy." *Id.* at 354 (quoting 49 U.S.C. § 32902(f)). As to implied preemption, the court determined that state GHG-emission standards do not "stand[] as an obstacle to the objectives of Congress," nor do they "usurp NHTSA's prerogative to set fuel economy standards." *Id.* at 398.

45. In December 2007, the U.S. District Court for the Eastern District of California rejected a claim that EPCA expressly or impliedly preempts GHG-emission standards for which EPA issues California a waiver of CAA preemption. *Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d 1151. As to express preemption, the court interpreted 49 U.S.C. § 32919(a) to preempt a state law only if "there is a narrow one-to-one correlation between the [state] pollution reduction regulation and the fuel efficiency standard," which there is not for GHG-emission standards. *Id.* at 1176. With respect to implied preemption, the court held that California's GHG-emission standards would not hinder EPCA's "objective of implementing the 'maximum feasible average fuel economy' standards." *Id.* at 1179 (quoting 49 U.S.C. § 32902(f)). The court observed that, even to the extent the state standards are "technology forcing," that "does not constitute an interference with EPCA's purpose of setting average fleet mileage standards to the maximum feasible level." *Ibid.*

46. Congress enacted the Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492 (EISA), against the backdrop of the court decisions described in paragraphs 43–45, *supra*. Congress rejected proposals from the George W. Bush Administration and individual legislators to overrule those decisions or otherwise preempt state authority to impose vehicular emission standards for which EPA has granted California a waiver of CAA preemption. *See* G. Dotson, *State Authority to Regulate Mobile Source Greenhouse Gas Emissions, Part 2: A Legislative and Statutory History Assessment*, Geo. Envtl. L. Rev. (forthcoming 2020), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3455700 (last visited Sept. 27, 2019), at 41–69. Instead, Congress took care not to disturb "the regulatory status of carbon dioxide or any other [GHG]" emitted from vehicles. EISA, § 210(b), 121 Stat. at 1532, *codified at* 42 U.S.C. § 7545(o)(12). *See generally id.* § 3, 121 Stat. at 1498 (clarifying that EISA preserves "authority provided" by the CAA and other "environmental law[s]" "[e]xcept to the extent expressly provided in this Act").

47. The EISA recognized and embraced California's authority to adopt and enforce GHG-emission standards more stringent than federal standards. For instance, Congress directed EPA to determine, for federal-procurement purposes, which automobile models were "low greenhouse gas emitting vehicles" after "tak[ing] into account the *most stringent* standards for vehicle greenhouse gas emissions applicable to and enforceable against … manufacturers for vehicles sold anywhere in the United States." EISA, § 141, 121 Stat. at 1518, *codified at* 42 U.S.C. § 13212(f)(2)(A), (3)(B) (emphasis added). Although "the only applicable [GHG] emission standards" in 2007 were "those adopted by California and other states" subject to EPA's grant of a waiver of CAA preemption, H.R. Rep. 110-297, pt. 1, at 17 (2007), Congress recognized that federal standards for vehicular emissions of GHGs might later be established at a different stringency, and the EISA contemplated the continuing efficacy of California standards in that event.

48. In 2008, EPA initially denied California's application for a waiver of CAA preemption to set standards for GHG emissions from light-duty vehicles of model years 2009 and later. *California State Motor Vehicle Pollution Control Standards; Notice of Decision Denying a Waiver of Clean Air Act Preemption for California's 2009 and Subsequent Model Year Greenhouse Gas Emission Standards for New Motor Vehicles*, 73 Fed. Reg. 12,156 (Mar. 6, 2008). But EPA premised the waiver denial on an interpretation of the CAA rather than EPCA or EISA. *See id.* at 12,159 (clarifying that the agency "d[id] not attempt to interpret or apply EPCA"). After EPA's waiver denial was challenged by California and other parties, including certain Plaintiffs here, EPA reversed course and decided to grant California the waiver to adopt and enforce GHG-emission standards for vehicles of model years 2009 and later. *California State Motor Vehicle Pollution Control Standards; Notice of Decision Granting a Waiver of Clean Air Act Preemption for California's 2009 and Subsequent Model Year Greenhouse Gas Emission Standards for New Motor Vehicles*, 74 Fed. Reg. 32,744 (July 8, 2009).

### vi. Harmonization of NHTSA's CAFE Standards with California's and EPA's GHG-Emission Standards

49. In 2010, EPA, NHTSA, and CARB instituted a "National Program" under which EPA and California would align their respective GHG-emission standards and NHTSA would harmonize its CAFE standards with those emission standards. The three agencies recognized that their approach was not mandated by law, but they adopted it as a policy matter in order to "deliver[ ] environmental and energy benefits, cost savings, and administrative efficiencies on a nationwide basis that might not be available under a less coordinated approach." EPA & NHTSA, *Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards*, 75 Fed. Reg. 25,324, 25,545 (May 7, 2010) (2010 Rule); *accord* EPA & NHTSA, *2017 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions and Corporate Average Fuel Economy Standards*, 77 Fed. Reg. 62,624, 62,964 (Oct. 15, 2012) (2012 Rule).

50. When establishing CAFE standards during this period, NHTSA once again did not dispute the validity of California GHG-emission standards. In particular, NHTSA considered "the harmonization benefits of the National Program," under which "the California …. standards" for GHG emissions matched those of EPA. 2012 Rule, 77 Fed. Reg. at 62,669; *see also* 2010 Rule, 75 Fed. Reg. at 25,556 n.550 (observing that, "[i]n the case of emission standards," 49 U.S.C. § 32902(f) requires NHTSA to consider "standards adopted by the States …, since in certain circumstances the [CAA] allows States to adopt and enforce State standards different from the Federal ones"). But NHTSA also found it "unnecessary" to dwell on EPCA's treatment of California standards at a time when "the consistent and coordinated Federal standards … apply nationally," including in California, "under the National Program." 2010 Rule, 75 Fed. Reg. at 25,675; *accord* 2012 Rule, 77 Fed. Reg. at 63,018.

51. In 2012, CARB adopted the Advanced Clean Cars rulemaking package, which included new GHG-emission standards aligned with EPA's standards under the National Program as well as ZEV mandates for light-duty vehicles of model years 2017 and later. 13 Cal. Code Regs. §§ 1961.3, 1962.2. CARB regulations state that, for model years 2017 through 2025, "a manufacturer may elect to demonstrate compliance with [California GHG-emission standards] by demonstrating compliance with" federal GHG-emission standards. *Id.* § 1961.3(c). In 2013, EPA issued a waiver of preemption for GHG and ZEV regulations in California's Advanced Clean Cars program. 2013 Waiver, 78 Fed. Reg. 2112.

52. Prior to the Preemption Rule, neither NHTSA nor EPA had ever taken a final action that was predicated on the position that EPCA preempts state GHG or ZEV regulations for which EPA has granted California a waiver of preemption under Section 209(b) of the CAA.

53. EPA has approved state implementation plans for national ambient air quality standards for California and many Section 177 States that incorporate the GHG and/or ZEV regulations from

California's Advanced Clean Cars program. *E.g.*, 40 C.F.R. § 52.220a(c) (California's implementation plan, incorporating ZEV regulations).

### vii. The National Environmental Policy Act

54. NEPA directs all federal agencies to prepare, before taking any "major Federal action[ ] significantly affecting the quality of the human environment, a detailed statement" of that action's environmental impacts. 42 U.S.C. § 4332(C). Major federal actions include the "[a]doption of official policy, such as rules, regulations, and interpretations." 40 C.F.R. § 1508.18(b)(1). NEPA's "detailed statement" is known as an environmental impact statement.

55. NEPA requires agencies to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken," 40 C.F.R. § 1500.1(b), in order that agencies like NHTSA "make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment," *id.* § 1500.1(c). Before finalizing a major federal action, NHTSA must disclose and consider its direct, indirect, and cumulative environmental impacts. *See id.* §§ 1502.16, 1508.7, 1508.8, 1508.27(b)(7).

56. If a federal agency's proposed action is of a type that normally does not require preparation of an environmental impact statement and is not categorically excluded by law from the requirement to prepare an environmental impact statement, the agency must prepare an environmental assessment. 40 C.F.R. § 1501.4(b). Based on the results of the environmental assessment, the agency must prepare either an environmental impact statement or a finding of no significant impact. *Id.* § 1501.4(c), (e).

57. NHTSA regulations provide that, for any "[r]ulemaking or regulatory action," 49 C.F.R. § 520.4(b)(3), an environmental impact statement generally should be prepared for "[a]ny proposed action which"—in light of "the overall, cumulative impact of the action[], other Federal projects or actions in the area, and any further contemplated or anticipated actions"—"ha[s] a potential for

significantly affecting the environment," "is likely to be controversial on environmental grounds," and/or "has unclear but potentially significant environmental consequences," *id.* § 520.5(a).

58. Any NHTSA action that "involves inconsistency with any Federal, State, or local law or administrative determination relating to the environment," 49 C.F.R. § 520.5(b)(6)(i), or "may directly or indirectly result in a significant increase in the amount of harmful emissions from the operation of a motor vehicle," *id.* § 520.5(b)(9), "should ordinarily be considered as significantly affecting the quality of the human environment," *id.* § 520.5(b)(6)(i).

### B. The Preemption Rule

59. On August 24, 2018, NHTSA and EPA published a notice of proposed rulemaking that proposed several actions with respect to new motor vehicles. *The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021–2026 Passenger Cars and Light Trucks*, 83 Fed. Reg. 42,986 (Proposed Rule). NHTSA and EPA jointly finalized certain of these actions on September 19, 2019.

60. In this lawsuit, Plaintiffs challenge only NHTSA's promulgation of the Preemption Rule, to be codified in Title 49 of the Code of Federal Regulations at §§ 531.7 and 533.7; Appendix B to Part 531; and Appendix B to Part 533. Notwithstanding NHTSA's assertion that its action rests in part on authority granted under 49 U.S.C. §§ 32901–03, *see* Final Rule, 84 Fed. Reg. at 51,361, the Preemption Rule is not "a regulation prescribed in carrying out" those statutory provisions. 49 U.S.C. § 32909(a)(1). The Preemption Rule is, however, a "final agency action," 5 U.S.C. § 704, that federal district courts have original jurisdiction to review under the APA, *see* 28 U.S.C. § 1331.

61. At the same time NHTSA finalized the Preemption Rule, EPA partially revoked the 2013 waiver of CAA preemption for CARB's Advanced Clean Cars program, *see* Final Rule, 84 Fed. Reg. at 51,350, and EPA reinterpreted Section 177 of the CAA not to permit a State other than California to adopt or enforce GHG standards for which EPA previously granted California a waiver of preemption under Section 209(b) of the CAA, *see id.* at 51,350–51. EPA's nationally applicable "final action[s]"

are not challenged here because the CAA vests federal courts of appeals with exclusive jurisdiction to review them. 42 U.S.C. § 7607(b)(1); *see also* Final Rule, 84 Fed. Reg. at 51,351–52.

62. When NHTSA issued the Preemption Rule, compliance with EPA's existing standards for GHG emissions from new light-duty vehicles was deemed compliance with all state GHG-emission standards, as a consequence of the California law discussed in paragraph 51, *supra*, and Section 177 of the CAA, which provides that vehicular GHG-emission standards adopted or enforced by other States shall be "identical to the California standards," 42 U.S.C. § 7507.

63. The preamble to the Preemption Rule does not assert that EPCA's preemption clause, 49 U.S.C. § 32919, vests NHTSA with authority to promulgate regulations respecting preemption.

64. In the preamble to the Preemption Rule, NHTSA recognizes "the self-executing nature of EPCA preemption." Final Rule, 84 Fed. Reg. at 51,325. But NHTSA elsewhere asserts not only the authority to issue implementing regulations as to EPCA preemption but also the necessity of doing so. *See id.* at 51,311, 51,316–17.

65. The preamble to the Preemption Rule asserts several times that NHTSA lacks discretion as to the content of the rule. *E.g.*, Final Rule, 84 Fed. Reg. at 51,354, 51,356, 51,358–60.

66. The Preemption Rule includes two regulations that restate 49 U.S.C. § 32919. *See* 49 C.F.R. § 531.7 (Final Rule, 84 Fed. Reg. at 51,361–62); *id.* § 533.7 (Final Rule, 84 Fed. Reg. at 51,362).

67. The Preemption Rule includes regulatory text declaring the following as facts:

(B) Carbon dioxide is the natural by-product of automobile fuel consumption.

(C) The most significant and controlling factor in making the measurements necessary to determine the compliance of automobiles with the fuel economy standards in [49 C.F.R. parts 531 and 533] is their rate of tailpipe carbon dioxide emissions.

(D) Almost all technologically feasible reduction of tailpipe emissions of carbon dioxide is achievable through improving fuel economy, thereby reducing both the consumption of fuel and the creation and emission of carbon dioxide;

(E) Accordingly, as a practical matter, regulating fuel economy controls the amount of tailpipe emissions of carbon dioxide, and regulating the tailpipe emissions of carbon dioxide controls fuel economy.

49 C.F.R. pt. 531, app'x B(a)(B)–(E) (Final Rule, 84 Fed. Reg. at 51,362); 49 C.F.R. pt. 533, app'x B(a)(B)–(E) (Final Rule, 84 Fed. Reg. at 51,362).

68. The Preemption Rule includes regulatory text declaring that "[a]utomobile fuel economy is directly and substantially related to automobile tailpipe emissions of carbon dioxide." 49 C.F.R. pt. 531, app'x B(a)(1)(A) (Final Rule, 84 Fed. Reg. at 51,362); 49 C.F.R. pt. 533, app'x B(a)(1)(A) (Final Rule, 84 Fed. Reg. at 51,362).

69. The Preemption Rule includes regulatory text declaring, with regard to express preemption under EPCA:

(1) To the extent that any law or regulation of a State or a political subdivision of a State regulates or prohibits tailpipe carbon dioxide emissions from automobiles, such a law or regulation relates to average fuel economy standards within the meaning of 49 U.S.C. 32919.

(2) As a law or regulation related to fuel economy standards, any law or regulation of a State or a political subdivision of a State regulating or prohibiting tailpipe carbon dioxide emissions from automobiles is expressly preempted under 49 U.S.C. 32919.

(3) A law or regulation of a State or a political subdivision of a State having the direct or substantial effect of regulating or prohibiting tailpipe carbon dioxide emissions from automobiles or automobile fuel economy is a law or regulation related to fuel economy standards and expressly preempted under 49 U.S.C. 32919.

49 C.F.R. pt. 531, app'x B(a)(1)–(3) (Final Rule, 84 Fed. Reg. at 51,362); 49 C.F.R. pt. 533, app'x B(a)(1)–(3) (Final Rule, 84 Fed. Reg. at 51,362–63).

70. The preamble to the Preemption Rule "fully reaffirms," Final Rule, 84 Fed. Reg. at 51,312, NHTSA's view that "[t]he conflict principles of implied preemption do not apply in fields where Congress has enacted an express preemption provision prohibiting even the existence of state standards," Proposed Rule, 83 Fed. Reg. at 43,236. "NHTSA has not concluded that implied preemption broadens

the scope of preemption established by Congress." Final Rule, 84 Fed. Reg. at 51,318. The preamble to

the Preemption Rule recognizes also that "implied preemption … is a fact-driven analysis." *Id.* at 51,319.

NHTSA nonetheless issued regulatory text respecting implied preemption under EPCA.

71. The Preemption Rule includes regulatory text declaring, with respect to implied preemption

under EPCA:

(1) A law or regulation of a State or a political subdivision of a State regulating tailpipe carbon dioxide emissions from automobiles, particularly a law or regulation that is not attribute-based and does not separately regulate passenger cars and light trucks, conflicts with:

(A) The fuel economy standards in [49 C.F.R. parts 531 and 533];

(B) The judgments made by [NHTSA] in establishing those standards; and

(C) The achievement of the objectives of the statute (49 U.S.C. Chapter 329) under which those standards were established, including objectives relating to reducing fuel consumption in a manner and to the extent consistent with manufacturer flexibility, consumer choice, and automobile safety.

(2) Any law or regulation of a State or a political subdivision of a State regulating or prohibiting tailpipe carbon dioxide emissions from automobiles is impliedly preempted under 49 U.S.C. Chapter 329.

(3) A law or regulation of a State or a political subdivision of a State having the direct or substantial effect of regulating or prohibiting tailpipe carbon dioxide emissions from automobiles or automobile fuel economy is impliedly preempted under 49 U.S.C. Chapter 329.

49 C.F.R. pt. 531, app'x B(b) (Final Rule, 84 Fed. Reg. at 51,362); 49 C.F.R. pt. 533, app'x B(b) (Final

Rule, 84 Fed. Reg. at 51,362–63).

72. The regulatory text of the Preemption Rule repeatedly refers to state laws and regulations

"regulating or prohibiting tailpipe carbon dioxide emissions from automobiles." The preamble of the

Preemption Rule makes clear that this text is meant to encompass both California's ZEV mandate and

its GHG emissions standards: "NHTSA also finalizes the view … that ZEV mandates are preempted

by EPCA. Such laws, which require that a certain number or percentage of vehicles sold or delivered

in a State by a manufacturer meet ZEV requirements, directly and substantially affect fuel economy

standards by requiring manufacturers to eliminate fossil fuel use in a portion of their fleet. Like State or local tailpipe GHG emissions standards, ZEV mandates require the application of additional efforts and resources beyond those needed to comply with Federal standards. ZEV mandates also directly conflict with the goals of EPCA as they apply irrespective of the Federal statutory factors the Secretary of Transportation (through NHTSA) is required to consider in setting fuel economy standards, including technological feasibility and economic practicability." Final Rule, 84 Fed. Reg. at 51,314.

73. Notwithstanding that EPCA's preemption clause operates only "[w]hen an average fuel economy standard prescribed under this chapter is in effect," 49 U.S.C. § 32919(a), the regulatory text in appendices to 49 C.F.R. parts 531 and 533 omits this restriction, and the preamble to the Preemption Rule declares preempted state laws applicable to vehicles manufactured in model years for which no prescribed CAFE standard is in effect, *see* Final Rule, 84 Fed. Reg. at 51,318–19.

74. The preamble to the Preemption Rule interprets the phrase "for automobiles covered by an average fuel economy standard under this chapter" in EPCA's preemption clause to modify only the term "average fuel economy standards" but not the term "fuel economy standards" in 49 U.S.C. § 32919(a). Final Rule, 84 Fed. Reg. at 51,318.

75. The regulatory text of the Preemption Rule does not distinguish between state laws that apply only to used automobiles, as opposed to new automobiles. The preamble to the Preemption Rule asserts that EPCA may preempt a state law or regulation that applies only to used automobiles, Final Rule, 84 Fed. Reg. at 51,318 n.96, notwithstanding that EPCA regulates automobiles at the point of manufacture, *see* 49 U.S.C. §§ 32901–04.

76. The preamble and regulatory text of the Preemption Rule do not address the restrictions (described in paragraph 41, *supra*) that 49 U.S.C. § 32902(h) imposes on NHTSA's determination of maximum feasible average fuel economy for purposes of establishing CAFE standards.

77. The preamble to the Preemption Rule "fully reaffirms," Final Rule, 84 Fed. Reg. at 51,312, NHTSA's view that EPCA does not preempt state laws "regulating the carbon intensity of fuels," Proposed Rule, 83 Fed. Reg. at 43,234 n.507.

78. The Preemption Rule does not assert that NHTSA has been delegated power to administer or interpret the CAA provisions that address state implementation plans. But, in the preamble to the Preemption Rule, NHTSA declares invalid GHG and ZEV regulations that are incorporated in the EPA-approved state implementation plans discussed in paragraph 53, *supra*. Final Rule, 84 Fed. Reg. at 51,324.

79. The preamble to the Preemption Rule states that "NHTSA has asserted preemption of certain State emission standards under EPCA on multiple occasions since 2002." Final Rule, 84 Fed. Reg. at 51,312. To support this statement, NHTSA cites only:

(i) statements in "a 2002 amicus brief" filed by the United States, a 2002 preamble to a proposed CAFE standard, and a 2003 preamble to a final CAFE standard, *ibid.*, none of which constituted final agency action or even addressed the question whether EPCA preempts state laws—like California's Advanced Clean Cars program—"that do not make specific reference to fuel economy standards," U.S. Br. as Amicus Curiae 29 n.10, *Cent. Valley Chrysler-Plymouth, Inc. v. Kenny*, 9th Cir. No. 02-16395, 2002 WL 32298119 (Oct. 2002);

(ii) statements in a 2005 preamble to a proposed CAFE standard and a 2006 preamble to a final CAFE standard, which statements NHTSA ultimately acknowledged were "entirely theoretical" and had no impact on any final action taken by the agency, Resp. Br. 129, *Ctr. for Biol. Diversity v. NHTSA*, 9th Cir. Nos. 06-71891(L), 2007 WL 1096332 (Mar. 7, 2007); *see also Ctr. for Biol. Diversity v. NHTSA*, 538 F.3d 1172, 1181 n.1 (9th Cir. 2008) (declining to review "the preemption discussion in the preamble of the [2006 final CAFE standard]" based on NHTSA's admission that it was "not final agency action"); and

(iii) statements in a 2008 preamble to a proposed rule that NHTSA abandoned on January 7, 2009, *see Average Fuel Economy Standards Passenger Cars and Light Trucks Model Year 2011*, 74 Fed. Reg. 14,196, 14,439 (Mar. 30, 2009).

80. NHTSA did not prepare an environmental impact statement, environmental assessment, or finding of no significant impact as to the Preemption Rule. The preamble to the Preemption Rule states that "NEPA does not apply to this action." Final Rule, 84 Fed. Reg. at 51,314.

81. EPA concurrently relied on NHTSA's position with respect to EPCA preemption, as set forth in the Preemption Rule, as an independent and severable basis for EPA's decision to revoke in part its 2013 waiver of CAA preemption for GHG and ZEV regulations in CARB's Advanced Clean Cars Program. *See* Final Rule, 84 Fed. Reg. at 51,328, 51,338.

## IV.   Standing

82. Plaintiffs have associational and organizational standing to seek declaratory and injunctive relief against NHTSA, namely, an order declaring the Preemption Rule invalid and vacating the rule.

83. Plaintiffs are organizations committed to the protection of public health and reduction of vehicular air pollution via deployment of pollution-reduction and pollution-elimination technologies.

84. Plaintiffs and their members benefit from current state laws—GHG and ZEV regulations in California and Section 177 States—that the Preemption Rule declares invalid. Each of these state laws reduces vehicular emissions of GHGs and other air pollutants and promotes the deployment of pollution-reduction and pollution-elimination technologies.

85. Plaintiffs' members—including but not limited to EDF member Kate Zalzal; NRDC member Ronald Rothschild; and Sierra Club members Kim Floyd and Vicente Perez Martinez—have standing based on their plans to purchase one or more new vehicles in California or a Section 177 State. Plaintiffs' members intend to consider ZEVs when they purchase a vehicle. The Preemption Rule, and other federal actions that have been or are likely to be predicated on that rule (including

EPA's partial revocation of California's 2013 waiver), will reduce the choices of ZEV vehicles available to Plaintiffs' members in California, Section 177 States, and elsewhere in the United States.

86. Plaintiffs' members—including but not limited to ELPC member Douglas Snower; and NRDC members James Burness and Robert Harrington—have standing based on their employment in the electric-vehicle industry and the concrete and particularized economic injuries they will suffer due to the Preemption Rule. The Preemption Rule, and other federal actions that have been or are likely to be predicated on that rule (including EPA's partial revocation of California's 2013 waiver), will inflict economic harm on these members by depressing demand for their services.

87. Plaintiffs' members—including but not limited to Center for Biological Diversity member Sylvia Arredondo; CLF member Daniel Hildreth; EDF members James Ausman, Arthur Cooley, Denise Fort, and Shana Reidy; Sierra Club members Kim Floyd and Vicente Perez Martinez; and UCS member Jerry Malczewski—have standing based on their injuries from GHG emissions, which will significantly increase as a result of the Preemption Rule and other federal actions that have been or are likely to be predicated on that rule (including EPA's partial revocation of California's 2013 waiver). Plaintiffs' members' concrete and particularized injuries include, but are not limited to, health problems exacerbated by climate change, economic harm from property damage caused by climate change, and recreational and aesthetic harms from climate change.

88. Plaintiffs' members—including but not limited to Center for Biological Diversity members Sylvia Arredondo and Janet DietzKamei; EDF member Dylan Brock; and Sierra Club members Kim Floyd and Vicente Perez Martinez—have standing based on injuries from emissions of so-called criteria pollutants (carbon monoxide, oxides of nitrogen, ozone, particulate matter, and sulfur dioxide) and their precursors, which emissions will significantly increase as a result of the Preemption Rule and other federal actions that have been or are very likely to be predicated on that rule (including EPA's partial revocation of California's 2013 waiver). Their concrete and particularized injuries include, but

are not limited to, health harms from increased criteria-pollutant emissions caused by the Preemption Rule.

89. The Preemption Rule harms Plaintiffs as organizations because it frustrates their mission to reduce vehicular air pollution by promoting the deployment of pollution-reduction and pollution-elimination technologies. The Rule prompts Plaintiffs to expend resources to counteract its harms. If all state GHG and ZEV regulations are preempted by EPCA, as the Rule indicates, then new federal and state rulemakings are needed to achieve the ends of those state laws, and Plaintiffs will be forced to devote time and resources to petitioning for and participating in those rulemakings.

90. A court order holding the Preemption Rule unlawful, setting the rule aside, and enjoining the United States and its agencies from relying on or enforcing the rule will redress injuries to Plaintiffs and their members, both in its own right, and by invalidating an independent basis for EPA's partial revocation of California's 2013 waiver and any related decisions by EPA and other federal actors.

91. Plaintiffs' individual members need not participate in this lawsuit in order for Plaintiffs to plead claims under the APA and for non-statutory review, or for this Court to award the declaratory and injunctive relief prayed for herein.

## V.     Claims

### COUNT I

### APA Violation: Exceedance of Statutory Authority

92. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 91.

93. This Court must "hold unlawful and set aside agency action … found to be … in excess of statutory … authority." 5 U.S.C. § 706(2)(C).

94. NHTSA cannot promulgate a regulation unless Congress has conferred such authority.

95. Preemption under EPCA is self-executing. The statute's preemption clause makes no reference to NHTSA or any other federal agency, nor does it envision any implementing regulations.

96. None of the statutory provisions on which NHTSA relies as authority for the Preemption Rule, *see* Final Rule, 84 Fed. Reg. at 51,361, authorizes issuance of regulations with respect to preemption under EPCA.

97. Congress has not conferred on NHTSA the "dut[y]" or power[]," 49 U.S.C. § 322(a), to promulgate regulations with respect to preemption under EPCA.

98. NHTSA promulgated the Preemption Rule in excess of statutory authority.

## COUNT II

**APA Violation: Agency Action, Findings, and Conclusions that are Arbitrary, Capricious, an Abuse of Discretion, Otherwise Not in Accordance with Law, and Unwarranted by the Facts**

99. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 91.

100. This Court must "hold unlawful and set aside agency action … found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "unwarranted by the facts," *id.* § 706(2)(F).

101. NHTSA erred as a matter of law in concluding that it is "necessary" to promulgate regulations as to EPCA preemption. Final Rule, 84 Fed. Reg. at 51,311, 51,316. NHTSA did not adequately explain why regulations implementing EPCA's preemption clause are necessary or appropriate or why, in light of NHTSA's determination that express and implied preemption under EPCA are coextensive, regulatory text on implied preemption (a fact-driven inquiry) is necessary or appropriate.

102. Courts owe no deference to NHTSA's interpretation of the scope of EPCA preemption in the Preemption Rule or the accompanying preamble. NHTSA has not been delegated authority to administer 49 U.S.C. § 32919 or determine its scope, and NHTSA based issuance of the Preemption Rule on a determination that the agency lacked discretion as to the scope of EPCA preemption and, hence, as to the content of the rule.

103. NHTSA's determination that state emission standards for which EPA has granted California a preemption waiver under Section 209(b) of the CAA are expressly and impliedly preempted by EPCA is not in accordance with law. EPCA requires that NHTSA consider those state emission standards, rather than declare them preempted, when the agency establishes CAFE standards. Congress has consistently recognized, before and after EPCA's enactment, the validity of state emission standards for which EPA has granted California a waiver of CAA preemption. That includes express congressional recognition of the GHG and ZEV regulations that the Preemption Rule declares void *ab initio*. For these reasons, the content of the Preemption Rule, including the regulatory text quoted in paragraphs 66–69 and 71, *supra*, is not in accordance with the CAA, EISA, and EPCA, including but not limited to the specific provisions described in paragraphs 19–48, *supra*.

104. The interpretation of the term "related to," 49 U.S.C. § 32919(a), in the Preemption Rule is not in accordance with the CAA, EISA, and EPCA, insofar as it purports to declare preempted state emission standards for which EPA has granted a waiver of preemption under Section 209(b) of the CAA. The interpretation of "related to" in the Preemption Rule is also arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

105. The Preemption Rule's conclusion that EPCA preempts state laws that regulate vehicles of model years for which no CAFE standard is "in effect," 49 U.S.C. § 32919(a), is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

106. The Preemption Rule's interpretation of the statutory phrase "for automobiles covered by an average fuel economy standard under this chapter" as not modifying the term "fuel economy standards," 49 U.S.C. § 32919(a), is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

107. The Preemption Rule's conclusion that EPCA preempts state laws and regulations that apply only to used automobiles is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

108. NHTSA's conclusion that EPA-approved state implementation plans are unenforceable insofar as they incorporate laws that the Preemption Rule declares preempted, *see* paragraph 78, *supra*, is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. It also is in excess of statutory authority because NHTSA lacks delegated authority to administer or interpret the CAA.

109. NHTSA's disregard for restrictions on its standard-setting authority imposed by 49 U.S.C. § 32902(h), as described in paragraph 41, *supra*, renders the Preemption Rule arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

110. NHTSA's reliance on the following declarations, set forth in the regulatory text of the Preemption Rule, to support the conclusion that EPCA preempts state GHG and ZEV regulations is arbitrary, capricious, an abuse of discretion, and unwarranted by the facts:

    (i)  Carbon dioxide is the natural by-product of automobile fuel consumption;

    (ii)  The most significant and controlling factor in making the measurements necessary to determine the compliance of automobiles with the fuel economy standards in [49 C.F.R. parts 531 and 533] is their rate of tailpipe carbon dioxide emissions;

    (iii)  Almost all technologically feasible reduction of tailpipe emissions of carbon dioxide is achievable through improving fuel economy, thereby reducing both the consumption of fuel and the creation and emission of carbon dioxide; and

    (iv)  Accordingly, as a practical matter, regulating fuel economy controls the amount of tailpipe emissions of carbon dioxide, and regulating the tailpipe emissions of carbon dioxide controls fuel economy.

49 C.F.R. pt. 531, app'x B(a)(B)–(E) (Final Rule, 84 Fed. Reg. at 51,362); 49 C.F.R. pt. 533, app'x B(a)(B)–(E) (Final Rule, 84 Fed. Reg. at 51,362).

111. The following declarations in the regulatory text of the Preemption Rule are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and unwarranted by the facts:

(i)   Automobile fuel economy is directly and substantially related to automobile tailpipe emissions of carbon dioxide;

(ii)  To the extent that any law or regulation of a State or a political subdivision of a State regulates or prohibits tailpipe carbon dioxide emissions from automobiles, such a law or regulation relates to average fuel economy standards within the meaning of 49 U.S.C. 32919;

(iii) As a law or regulation related to fuel economy standards, any law or regulation of a State or a political subdivision of a State regulating or prohibiting tailpipe carbon dioxide emissions from automobiles is expressly preempted under 49 U.S.C. 32919;

(iv)  A law or regulation of a State or a political subdivision of a State having the direct or substantial effect of regulating or prohibiting tailpipe carbon dioxide emissions from automobiles or automobile fuel economy is a law or regulation related to fuel economy standards and expressly preempted under 49 U.S.C. 32919;

(v)   A law or regulation of a State or a political subdivision of a State regulating tailpipe carbon dioxide emissions from automobiles, particularly a law or regulation that is not attribute-based and does not separately regulate passenger cars and light trucks, conflicts with:

(A) The fuel economy standards in [49 C.F.R. parts 531 and 533];

(B) The judgments made by [NHTSA] in establishing those standards; and

(C) The achievement of the objectives of the statute (49 U.S.C. Chapter 329) under which those standards were established, including objectives relating to reducing fuel consumption in a manner and to the extent consistent with manufacturer flexibility, consumer choice, and automobile safety;

(vi)  Any law or regulation of a State or a political subdivision of a State regulating or prohibiting tailpipe carbon dioxide emissions from automobiles is impliedly preempted under 49 U.S.C. Chapter 329; and

(vii) A law or regulation of a State or a political subdivision of a State having the direct or substantial effect of regulating or prohibiting tailpipe carbon dioxide emissions from automobiles or automobile fuel economy is impliedly preempted under 49 U.S.C. Chapter 329.

49 C.F.R. pt. 531, app'x B (Final Rule, 84 Fed. Reg. at 51,362); 49 C.F.R. pt. 533, app'x B (Final Rule, 84 Fed. Reg. at 51,362–63).

112. Whether a state law is impliedly preempted under the doctrine of conflict preemption cannot be determined absent a case-specific inquiry that NHTSA failed to conduct. That failure renders the findings and conclusions in the Preemption Rule as to implied preemption arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and unwarranted by the facts.

113. The Preemption Rule does not carry NHTSA's burden to explain the departures from factual findings and legal conclusions on which the agency predicated prior final actions, including but not limited to the actions cited in paragraphs 28–30, 34, and 49–50, *supra*. Further, NHTSA did not adequately address the serious reliance interests of Plaintiffs, California and Section 177 States, industry, and others that were engendered by NHTSA's prior policy. NHTSA's failure to adequately address departures from prior findings and conclusions of law or to consider those serious reliance interests renders the Preemption Rule arbitrary and capricious.

114. NHTSA failed to adequately respond to material public comments on the Preemption Rule, including but not limited to comments addressing the legal and factual relationships between GHG-emission standards and CAFE standards. NHTSA's failure to provide a reasoned response to significant public comments violates the agency's duty under the APA and renders the Preemption Rule unlawful.

115. EPCA does not expressly or impliedly preempt state GHG-emission standards or ZEV mandates. The Preemption Rule's conclusion to the contrary is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and unwarranted by the facts.

116. The Preemption Rule is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and unwarranted by the facts, for reasons including but not limited to those stated in paragraphs 101–115, *supra*.

## COUNT III

**APA Violation: Failure to Observe Procedures of the National Environmental Policy Act**

117. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 91.

118. This Court must "hold unlawful and set aside agency action … found to be … without observance of procedure required by law." 5 U.S.C. § 706(2)(D). NHTSA issued the Preemption Rule without observance of procedures required by NEPA.

119. This Court must "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). NHTSA unlawfully withheld NEPA documentation for the Preemption Rule.

120. NHTSA's determination that "NEPA does not apply to" the Preemption Rule, Final Rule, 84 Fed. Reg. at 51,354, is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and unwarranted by the facts.

121. NHTSA's disregard of NEPA's procedural requirements resulted in an ill-informed and substantively flawed Preemption Rule. NHTSA failed to consider, for example, that the state ZEV regulations it declares invalid (including, but not limited to, California's ZEV regulations) significantly reduce emissions of air pollutants that harm public health and welfare. NHTSA's assertions to the contrary are arbitrary, capricious, an abuse of discretion, and unwarranted by the facts.

122. The Preemption Rule is a major federal action significantly affecting the quality of the human environment.

123. NHTSA violated NEPA and applicable regulations by not preparing an environmental impact statement, environmental assessment, or finding of no significant impact for the Preemption Rule.

124. The preamble to the Preemption Rule states that "this action does not have significant environmental impacts to the quality of the human environment." Final Rule, 84 Fed. Reg. at 51,355. But the preamble does not make a valid finding of no significant impact. Its discussion of

environmental impacts is not based on an environmental assessment, as required by 40 C.F.R. § 1501.4(e). NHTSA's statement also is not in accordance with law and is unwarranted by the facts because significant environmental impacts do flow from the Preemption Rule.

## COUNT IV

### Non-statutory Review of *Ultra Vires* Agency Action

125. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 91.

126. Issuance of any regulation respecting preemption under EPCA is clearly and completely outside the scope of powers delegated to defendants. Neither the Department of Transportation nor NHTSA has any duties and powers respecting preemption under EPCA.

127. Promulgation of the Preemption Rule is an *ultra vires* action against which this Court has equitable power to grant relief.

## VI.    Prayer for relief

WHEREFORE, Plaintiffs respectfully request the following relief:

1. A declaration that the Preemption Rule is invalid because it is contrary to the APA, CAA, EISA, EPCA, and NEPA, and is *ultra vires*;

2. An order vacating the Preemption Rule and permanently enjoining the United States and its agencies and officers from relying on or enforcing the rule;

3. An award of Plaintiffs' reasonable costs and attorney fees in this matter; and

4. Any other relief that this Court deems just and proper.

Respectfully submitted,

/s/ Matthew Littleton
Matthew Littleton (D.C. Bar No. 1602328)
Sean H. Donahue (D.C. Bar No. 450940)
DONAHUE, GOLDBERG, WEAVER & LITTLETON
1008 Pennsylvania Avenue SE
Washington, DC 20003
(202) 683-6895
matt@donahuegoldberg.com

Vickie L. Patton
Peter M. Zalzal
Alice Henderson
ENVIRONMENTAL DEFENSE FUND
2060 Broadway, Suite 300
Boulder, CO 80302
(303) 447-7215
vpatton@edf.org

Martha Roberts†
ENVIRONMENTAL DEFENSE FUND
1875 Connecticut Avenue NW, Suite 600
Washington, DC 20009
(202) 572-3243
mroberts@edf.org

Counsel for Environmental Defense Fund

/s/ Anchun Jean Su        (by permission)
Anchun Jean Su (D.C. Bar No. CA285167)
CENTER FOR BIOLOGICAL DIVERSITY
1411 K Street NW, Suite 1300
Washington, DC 20005
(202) 849-8399
jsu@biologicaldiversity.org

Maya Golden-Krasner*
CENTER FOR BIOLOGICAL DIVERSITY
660 South Figueroa Street, Suite 1000
Los Angeles, CA 90017
(213) 785-5402
mgoldenkrasner@biologicaldiversity.org

Counsel for Center for Biological Diversity

/s/ Emily K. Green         (by permission)
Emily K. Green (D.C. Bar. No. ME0002)
CONSERVATION LAW FOUNDATION
53 Exchange Street, Suite 200
Portland, ME 04102
(207) 210-6439
egreen@clf.org

*Counsel for Conservation Law Foundation*

/s/ Michael Landis         (by permission)
Michael Landis*
THE CENTER FOR PUBLIC INTEREST RESEARCH
1543 Wazee Street, Suite 400
Denver, CO 80202
(303) 573-5995 ext. 389
mlandis@publicinterestnetwork.org

*Counsel for Environment America*

/s/ Robert Michaels         (by permission)
Robert Michaels*
Ann Jaworski*
ENVIRONMENTAL LAW & POLICY CENTER
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
(312) 795-3713
rmichaels@elpc.org

*Counsel for Environmental Law & Policy Center*

/s/ Ian Fein      (by permission)
Ian Fein (D.D.C. Bar. No. CA00014)
NATURAL RESOURCES DEFENSE COUNCIL
111 Sutter Street, 21st Floor
San Francisco, CA 94104
(415) 875-6100
ifein@nrdc.org

David D. Doniger (D.C. Bar. No. 305383)
NATURAL RESOURCES DEFENSE COUNCIL
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 289-6868
ddoniger@nrdc.org

*Counsel for Natural Resources Defense Council, Inc.*

/s/ *Scott L. Nelson*        (by permission)
Scott L. Nelson (D.C. Bar No. 413549)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
snelson@citizen.org

*Counsel for Public Citizen, Inc.*

/s/ *Joanne Spalding*        (by permission)
Joanne Spalding[†]
Alejandra Núñez*
SIERRA CLUB
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5725
joanne.spalding@sierraclub.org

David S. Baron (D.C. Bar. No. 464222)
EARTHJUSTICE
1625 Massachusetts Avenue NW
Washington, DC 20036
(202) 667-4500
dbaron@earthjustice.org

Paul Cort*
Regina Hsu*
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA 94111
(415) 217-2077
pcort@earthjustice.org

Vera Pardee*
726 Euclid Avenue
Berkeley, CA 94708
(858) 717-1448
pardeelaw@gmail.com

*Counsel for Sierra Club*

/s/ Travis Annatoyn _____ (by permission)
Travis Annatoyn (D.C. Bar No. 1616605)
Javier Guzman (D.C. Bar No. 462679)
DEMOCRACY FORWARD FOUNDATION
1333 H Street NW
Washington, DC 20005
(202) 601-2483
tannatoyn@democracyforward.org

*Counsel for Union of Concerned Scientists*

† Application for regular admission pending
*Motion for admission *pro hac vice* to be filed

Dated: September 27, 2019