**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STATE OF CALIFORNIA, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>ELAINE L. CHAO, et al.,<br><br>    Defendants,<br><br>  and<br><br>THE COALITION FOR SUSTAINABLE AUTOMOTIVE REGULATION and THE ASSOCIATION OF GLOBAL AUTOMAKERS, INC.,<br><br>    Movant-Intervenors. | No: 1:19-cv-2826-KBJ |
| ENVIRONMENTAL DEFENSE FUND, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>ELAINE L. CHAO, et al.,<br><br>    Defendants,<br><br>  and<br><br>THE COALITION FOR SUSTAINABLE AUTOMOTIVE REGULATION and THE ASSOCIATION OF GLOBAL AUTOMAKERS, INC.,<br><br>    Movant-Intervenors. | No: 1:19-cv-2907-KBJ |

## MOTION TO INTERVENE
## BY THE COALITION FOR SUSTAINABLE AUTOMOTIVE REGULATION
## AND THE ASSOCIATION OF GLOBAL AUTOMAKERS, INC.

Pursuant to Federal Rule of Civil Procedure 24(c) and Local Civil Rule 7(j), the Coalition for Sustainable Automotive Regulation (the "Coalition") and the Association of Global Automakers, Inc. ("Global Automakers")[1] hereby move to intervene in the above-captioned proceedings in support of the Defendants.  The Coalition and Global Automakers ("Movant-Intervenors") rely on the accompanying statement of points and authorities.[2]

Pursuant to Local Civil Rule 7(m), Movant-Intervenors have conferred with counsel for Plaintiffs and Defendants.  Plaintiffs have stated that they take no position on this Motion. Defendants do not object to Movant-Intervenors' intervention in this matter.

Dated:   October 31, 2019

Respectfully submitted,

/s/ *Raymond B. Ludwiszewski*

RAYMOND B. LUDWISZEWSKI
Bar No. 420540
RACHEL LEVICK CORLEY
Bar No. 1024969
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8500
Fax: (202) 467-0539

*Attorneys for the Coalition for Sustainable Automotive Regulation and the Association of Global Automakers, Inc.*

---

[1]     This motion is not being brought on behalf of American Honda Motor Co., Inc., which is a member of Global Automakers.

[2]     Consistent with the obligations under Federal Rule of Civil Procedure 24(c) and Local Civil Rule 7(j), which require that a party file concurrently with a motion to intervene a "pleading that sets out the claim or defense for which intervention is sought," Fed. R. Civ. P. 24(c), Movant-Intervenors are filing herewith a notice of intent to join Defendants' Motion to Dismiss or Transfer, *see* Dkt. Nos. 26, 27.  Consistent with this Court's General Order and Guidelines Applicable to APA Cases, Dkt. No. 10, Movant-Intervenors are not filing the proposed joinder motion to dismiss on CM/ECF at this time, but shall serve the motion on all parties and notify the Court of such service.

# TABLE OF CONTENTS

Page

STATEMENT OF INTEREST ................................................................................... 1

BACKGROUND ....................................................................................................... 4

I.      NHTSA's Authority to Establish Motor Vehicle Fuel Economy Standards at the Federal Level .................................................................................................. 4

II.     State Regulation of Motor Vehicle Fuel Economy ................................................. 5

III.    Litigation Concerning California's GHG Emission Regulation, Which Led to the 2010 "One National Program" ......................................................................... 7

IV.    The Current Federal Rulemaking Being Challenged Here and California's Withdrawal from the One National Program ...................................................... 9

GROUNDS FOR INTERVENTION ........................................................................ 11

I.      Intervention as of Right ................................................................................ 11

    A.    The Motion Is Timely. ........................................................................ 12

    B.    Movant-Intervenors Claim an Interest Relating to the Property or Transaction Which Is the Subject of These Actions. ............................... 12

    C.    Disposition of These Actions May as a Practical Matter Impair or Impede Movant-Intervenors' Ability to Protect That Interest. ............................. 13

    D.    Movant-Intervenors' Interests Will Not Be Adequately Represented by Existing Parties in the Lawsuit. .......................................................... 14

    E.    As Associations Representing a Substantial Portion of the Regulated Industry, Movant-Intervenors Have Standing Under Article III. ............ 15

II.     Permissive Intervention .................................................................................. 17

CONCLUSION ........................................................................................................ 17

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Air All. Houston v. EPA,*
906 F.3d 1049 (D.C. Cir. 2018) ........................................................................ 16

*Ass'n of Int'l Auto. Mfrs. v. Torti,*
No. 2:05-cv-304 (D. Vt. Nov. 18, 2005) .............................................................. 7

*California v. EPA,*
No. 18-114 (D.C. Cir. Oct. 18, 2018) ................................................................ 17

*Cent. Valley Chrysler-Jeep, Inc. v. Goldstene,*
Nos. 08-17378 & 08-17380 (9th Cir. Apr. 6, 2007) ............................................ 8

*Cent. Valley Chrysler-Jeep, Inc. v. Goldstene,*
529 F. Supp. 2d 1151 (E.D. Cal. 2007) ............................................................... 8

*Crossroads Grassroots Policy Strategies v. FEC,*
788 F.3d 312 (D.C. Cir. 2015) .......................................................................... 16

*Dimond v. Dist. of Columbia,*
792 F.2d 179 (D.C. Cir. 1986) .......................................................................... 15

*Forest Cty. Potawatomi Cmty. v. United States,*
317 F.R.D. 6 (D.D.C. 2016) .............................................................................. 12

*Fund for Animals, Inc. v. Norton,*
322 F.3d 728 (D.C. Cir. 2003) .................................................... 12, 14, 15, 16, 17

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie,*
No. 2:05-cv-302 (D. Vt. Nov. 18, 2005) .............................................................. 7

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie,*
508 F. Supp. 2d 295 (D. Vt. 2007) ...................................................................... 7

*Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.,*
724 F.3d 206 (D.C. Cir. 2013) .......................................................................... 17

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) .......................................................................................... 15

*Nat'l Lime Ass'n v. EPA,*
233 F.3d 625 (D.C. Cir. 2000) .......................................................................... 17

*Smoke v. Norton,*
252 F.3d 468 (D.C. Cir. 2001) .......................................................................... 12

**Statutes**

49 U.S.C. § 32902(a) ............................................................................................ 4

49 U.S.C. § 32902(f) ............................................................................................. 4

49 U.S.C. § 32919(a) ............................................................................................ 2

Cal. Code Regs. tit. 13, § 1961.1 ........................................................................ 5

**Rules**

Fed. R. Civ. P. 24(b)(1)(B) .................................................................................. 17

Fed. R. Civ. P. 24 advisory committee's note ................................................... 13

**Regulations**

49 C.F.R. § 1.95 (2016) ........................................................................................ 4

49 C.F.R. § 531.7 ................................................................................................ 11

49 C.F.R. pt. 531, app. B .................................................................................... 11

70 Fed. Reg. 51,414 (Aug. 30, 2005) ................................................................... 6

71 Fed. Reg. 17,566 (Apr. 6, 2006) ................................................................. 5, 6

75 Fed. Reg. 25,324 (May 7, 2010) ............................................................ 8, 9, 13

83 Fed. Reg. 42,986 (Aug. 24, 2018) ................................................................... 4

84 Fed. Reg. 51,310 (Sept. 27, 2019) ............................................................ 4, 11

**Other Authorities**

Alliance of Automobile Manufacturers' Comments on the 2018 NPRM (Oct. 29, 2018),
    Dkt. No. NHTSA-2018-0067-12073 ........................................................... 10–11

FCA Comments on the 2018 NPRM (Oct. 26, 2018),
    Dkt. No. NHTSA-2018-0067-11943 ................................................................ 10

Global Automakers' Comments on the 2018 NPRM (Oct. 29, 2018),
    Dkt. No. NHTSA-2018-0067-12032 ................................................................ 10

GM Comments on the 2018 NPRM (Oct. 26, 2018),
    Dkt. No. NHTSA-2018-0067-11858 ................................................................ 10

TMNA Comments on the 2018 NPRM (Oct. 26, 2018),
Dkt. No. NHTSA-2018-0067-12150 ................................................................. 10

Jody Freeman, *The Obama Administration's National Auto Policy: Lessons from
the "Car Deal,"* 35 Harv. Envtl. L. Rev. 343, 358 (2011) ................................. 9, 11

**STATEMENT OF POINTS AND AUTHORITIES
IN SUPPORT OF THE MOTION TO INTERVENE
BY THE COALITION FOR SUSTAINABLE AUTOMOTIVE REGULATION
AND THE ASSOCIATION OF GLOBAL AUTOMAKERS, INC.**

Pursuant to Federal Rule of Civil Procedure 24(a)(2) or, alternatively, Rule 24(b)(1)(B), the Coalition for Sustainable Automotive Regulation (the "Coalition") and the Association of Global Automakers, Inc. ("Global Automakers") move to intervene in the above-captioned proceedings in support of Defendants. The Coalition and Global Automakers ("Movant-Intervenors") have a direct and substantial interest in this matter. Movant-Intervenors' interests and the grounds for intervention are set forth below.

**STATEMENT OF INTEREST**

1.      For more than 40 years, the federal government has regulated automotive fuel economy and, in so doing, has also regulated greenhouse gas (GHG) emissions from cars and trucks sold in the United States. From 1975 through 2010, the National Highway Traffic Safety Administration (NHTSA), which administers the federal fuel economy program, was the sole national regulator. Since 2010, NHTSA and the Environmental Protection Agency (EPA) have coordinated a joint federal fuel economy and GHG regulation, with input from California. Regulators and the auto industry colloquially call the coordinated program the "One National Program." This framework has reduced the auto industry's need to comply with overlapping and inconsistent regulations that drive up costs and compliance burdens. It has also ensured consumers enjoy a wide selection of vehicles to meet their driving needs.

2.      Recent rulemakings at the state level threaten to upend this balanced approach. In response to federal proposals to amend fuel economy and GHG emission standards during the agreed "Mid-Term Evaluation," California has taken steps to separately amend its own regulations to deviate from the One National Program approach. The auto industry hoped to avoid this

outcome and urged California and the federal government to reach an accommodation that would avoid disruption to a unified regulatory program with amended federal standards that would meet California's objectives, as well as those of EPA and NHTSA.   This result has not yet been achieved, although it remains the most economical and preferred approach for Movant-Intervenors.

3.       After California amended its "deemed-to-comply" regulation, NHTSA finalized the rule at issue here, which reasserts the agency's long-standing and unbroken position concerning the proper federal and state roles in regulating motor vehicle fuel economy.   Congress clearly articulated these roles in the text of the Energy Policy and Conservation Act of 1975 (EPCA), which provides that states "may not adopt or enforce a law or regulation related to fuel economy standards or average fuel economy standards." 49 U.S.C. § 32919(a).  EPCA's express preemption provision has no exception for state regulation of carbon dioxide emissions—regulation that Congress and the expert federal agencies observe to be indistinguishable from fuel economy standards.   Under the One National Program, NHTSA deferred further consideration of this position in light of the coordinated regulatory approach between NHTSA, EPA, and California. This issue is of central importance to Movant-Intervenors, given the significance of ongoing regulatory harmony and certainty to the auto industry and regulatory stakeholders.

4.       Global Automakers represents the U.S. operations of international motor vehicle manufacturers, original equipment suppliers, automotive technology companies, and other automotive-related trade associations. Global Automakers' mission is to advocate for policies that help foster a vibrant, growing, free, and open U.S. automotive industry for all stakeholders. Global Automakers collaborates with industry leaders, legislators, regulators, and other stakeholders in Washington, D.C. and 50 state capitals to create the kind of public policy that promotes innovation,

vehicle safety, and environmental responsibility.  Global Automakers' automobile manufacturer members include Aston Martin Lagonda of North America, Inc., Ferrari North America, Inc., Hyundai Motor America, Isuzu Motors America, LLC, Kia Motors America, Inc., Maserati North America, Inc., McLaren Automotive, Ltd., Nissan North America, Inc., Subaru of America, Inc., Suzuki Motor of America, Inc., and Toyota Motor North America, Inc. (TMNA).[1]  In 2018, Global Automakers' members accounted for nearly 40 percent of all U.S. production and 45 percent of all U.S. sales of passenger vehicles and light trucks.

5.      The Coalition is an unincorporated association representing five automobile manufacturers and industry groups who collectively produce and sell a substantial percentage of passenger vehicles and light-duty trucks sold in the United States.  The Coalition's members include FCA US LLC (FCA), General Motors LLC (GM), Mazda Motor of America d/b/a Mazda North American Operations (Mazda), Mitsubishi Motors North America (Mitsubishi), Toyota Motor North America, Inc. (TMNA), Global Automakers, and the National Automobile Dealers Association.  The Coalition's mission is to participate in activities, including rulemaking and litigation, to protect the rights and interests of original equipment automobile manufacturers and other automotive-related stakeholders.  Among other goals, the Coalition seeks to protect its members' interests by having one single regulatory framework established at the national level addressing automobile industry regulation, including fuel economy, GHG emissions, and zero-emission vehicle (ZEV) requirements.  The Coalition seeks a national regulatory program that includes feasible increases in fuel economy, along with holistic market-based approaches that

---

[1]      American Honda Motor Co., Inc. is also a member of Global Automakers but has reached an accommodation with California, and this motion is therefore not brought on its behalf.

facilitate the continued transition to motor vehicles that utilize efficient advanced technologies, including electrification.

## BACKGROUND

6.     These actions concern the joint final rule of the EPA and the NHTSA titled The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program, 84 Fed. Reg. 51,310 (Sept. 27, 2019) (the "ONP Rule").   The ONP Rule announced the agencies' final action on a portion of the joint rulemaking package that was proposed by EPA and NHTSA on August 24, 2018.  *See* The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021–2026 Passenger Cars and Light Trucks, Notice of Proposed Rulemaking, 83 Fed. Reg. 42,986 (Aug. 24, 2018) (the "2018 NPRM").

## I.     NHTSA's Authority to Establish Motor Vehicle Fuel Economy Standards at the Federal Level

7.     Although these actions do not address the fuel economy standards that NHTSA is expected to promulgate, they do concern NHTSA's authority to do so and whether a state may also promulgate its own fuel economy standards under the guise of GHG emission and ZEV standards.

8.     EPCA provides that "the Secretary of Transportation shall prescribe by regulation average fuel economy standards for automobiles manufactured by a manufacturer in that model year," and that "[e]ach standard shall be the maximum feasible average fuel economy level that the Secretary decides the manufacturers can achieve in that model year."  49 U.S.C. § 32902(a). That authority has been delegated to NHTSA.  *See* 49 C.F.R. § 1.95 (2016).

9.     "Maximum feasible" fuel economy is a statutory term of art, and it refers to a determination that is to be singularly made by NHTSA, balancing "technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on fuel economy, and the need of the United States to conserve energy."  49 U.S.C. § 32902(f).  NHTSA

4

interprets the "technological feasibility" and "economic practicability" factors as requiring that the fuel economy standards it establishes do not: (a) limit the choice of cars and trucks available to consumers; (b) cause economic hardship for the industry; (c) result in a significant loss of domestic employment; or (d) result in adverse safety consequences. *See, e.g.*, Average Fuel Economy Standards for Light Trucks Model Years 2008–2011, 71 Fed. Reg. 17,566, 17,580 (Apr. 6, 2006) (the "2006 Light Truck Standards").

## II.    State Regulation of Motor Vehicle Fuel Economy

10.    The ONP Rule is the latest in a string of federal and state rulemakings and related litigation addressing whether states have authority to regulate GHG emissions (virtually exclusively, carbon dioxide ($CO_2$)), which are mathematically identical to motor vehicle fuel economy.  In 2004, the California Air Resources Board (CARB) promulgated, for the first time, regulations setting fleet-average GHG emission standards.  *See* Cal. Code Regs. tit. 13, § 1961.1. The emission requirements set forth in the California regulations require control of $CO_2$ emissions.

11.    This is by no means the first time that EPCA preemption has been at the fore. California's actions required the expert federal agency, NHTSA, to consider in 2005 and 2006 whether a state $CO_2$ emission regulation is "related to" a fuel economy standard and is thus expressly preempted under EPCA, and whether such a regulation would conflict with the agency's implementation of the federal fuel economy program.  After careful consideration, the agency answered both questions in the affirmative.  *See* 2006 Light Truck Standards, 71 Fed. Reg. at 17,654–17,670.

12.    Similarly, in a 2005 notice of proposed rulemaking concerning light truck standards, NHTSA articulated its position that given "the need for a uniform, federal system" regulating motor vehicle fuel economy, a "state law that seeks to reduce motor vehicle carbon dioxide emissions is both expressly and impliedly preempted" under EPCA.  Average Fuel

Economy Standards for Light Trucks; Model Years 2008–2011, Notice of Proposed Rulemaking, 70 Fed. Reg. 51,414, 51,457 (Aug. 30, 2005). NHTSA concluded that "[s]ince the way to reduce carbon dioxide emissions is to improve fuel economy, a state regulation seeking to reduce those emissions is a 'regulation related to fuel economy standards or average fuel economy standards.'" *Id.* (quoting 49 U.S.C. § 32919(a)).

13.    NHTSA reaffirmed this view the following year in the final rule and provided a detailed discussion (spanning 16 pages in the Federal Register) concerning why state $CO_2$ emission regulations are related to fuel economy standards and thus expressly and impliedly preempted under EPCA.

> In mandating federal fuel economy standards under EPCA, Congress has expressly preempted any state laws or regulations relating to fuel economy standards. A State requirement limiting $CO_2$ emissions is such a law or regulation because it has the direct effect of regulating fuel consumption. … [B]ecause there is but one pool of technologies for reducing tailpipe $CO_2$ emissions and [at the same time] increasing fuel economy …, regulation of $CO_2$ emissions and fuel consumption are inextricably linked. It is therefore NHTSA's conclusion that such regulation is expressly preempted.

2006 Light Truck Standards, 71 Fed. Reg. at 17,654.

14.    The 2006 Light Truck Standards also addressed the question of whether state $CO_2$ emission standards conflict with NHTSA's implementation of the CAFE statute:

> [T]he State GHG standard … regulat[ing] tailpipe $CO_2$ emissions[] would frustrate the objectives of Congress in establishing the CAFE program and conflict with the efforts of NHTSA to implement the program in a manner consistent with the commands of EPCA. Congress had a variety of interrelated objectives in enacting EPCA and has charged NHTSA with balancing and achieving them. … Setting standards that are more stringent than the fuel economy standards promulgated under EPCA would upset the efforts of NHTSA to balance and achieve Congress's competing goals.

*Id.* at 17,667.

### III.   Litigation Concerning California's GHG Emission Regulation, Which Led to the 2010 "One National Program"

15.     After California promulgated its GHG emission regulation, the automotive industry (including Global Automakers[2] and several members of the Coalition) filed federal lawsuits in California and in two other states that had adopted California's regulations.  The suits alleged that (a) given the direct, mathematical link between $CO_2$ emissions and motor vehicle fuel economy, the California regulations were expressly preempted under EPCA, and (b) state $CO_2$ emission regulations conflict with NHTSA's implementation of federal fuel economy laws.  *See* Complaint at 34–36, *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, No. 2:05-cv-302 (D. Vt. Nov. 18, 2005); Complaint at 19–20, *Ass'n of Int'l Auto. Mfrs. v. Torti*, No. 2:05-cv-304 (D. Vt. Nov. 18, 2005).  These actions were based in part on NHTSA's conclusions on preemption.

16.     Despite NHTSA's technical and legal views concerning the scientific and mathematical relationship between fuel economy standards and GHG emission regulations— indeed, without even acknowledging them—the district court in Vermont, hearing one of the challenges, found that California's GHG emission standards are not preempted under EPCA if California obtains a waiver from EPA under Section 209(b) of the Clean Air Act.  *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295 (D. Vt. 2007).  In a separate case, a California district court subsequently dismissed EPCA preemption claims on a theory different from that adopted by the Vermont district court.  *Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d 1151, 1172–73 (E.D. Cal. 2007).

17.     Both the Vermont and California decisions were appealed to their respective circuit courts.  In the interim, however, the automobile industry and regulators from EPA, NHTSA, and

---

[2]      At the time, Global Automakers was known as the Association of International Automobile Manufacturers (AIAM).

CARB reached an agreement for the "One National Program" to address motor vehicle fuel economy and GHG emissions in a coordinated and harmonized fashion.  This commitment resulted in joint fuel economy and GHG emission standards promulgated by NHTSA and EPA in 2010 covering Model Year (MY) 2012 through MY 2016.  *See* Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards, 75 Fed. Reg. 25,324 (May 7, 2010) (the "2010 Joint Rule").  For its part, CARB incorporated into its separate, previously adopted GHG regulations a "deemed-to-comply" provision, whereby automakers could show compliance with California's state GHG emission standards by complying with EPA's MY 2012–2016 GHG regulations.

18.     At the time that the One National Program agreement had been reached, the appeal of the *Green Mountain Chrysler* matter had been fully briefed and argued to the Second Circuit, and the appeal of the *Central Valley Chrysler-Jeep* matter had been briefed in the Ninth Circuit. In consideration of the One National Program, the industry challengers were required to dismiss their appeals of the challenges to the California regulation.  Significantly, these dismissals were without prejudice to the industry challengers' ability to renew claims of EPCA preemption in the event of a breakdown of the One National Program.  *See, e.g.*, Joint Stipulation Re Terms of Dismissal at 1–2, *Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*, Nos. 08-17378 & 08-17380 (9th Cir. Apr. 6, 2010), Dkt. No. 55-2 (stipulating that dismissal is "without prejudice to any party's right to make the same legal arguments in any future actions challenging any future state motor vehicle greenhouse gas emissions regulation," and that the parties waive any legal defense that future actions are "barred by … preclusive doctrines, based on orders or decisions that are the subject of this appeal").  Thus, all parties, including the auto industry, maintained the ability to

defend their rights in the event the issue at hand was ever reconsidered. Movant-Intervenors, however, continue to prefer a solution resulting in One National Program.

19. The One National Program was important to the auto industry because it addressed the central concern raised by the lawsuits challenging California's regulations: multiple, overlapping, and inconsistent standards regulating motor vehicle fuel economy. As EPA and NHTSA pointed out:

> [ONP] represents regulatory convergence by making it possible for the standards of two different Federal agencies and the standards of California and other states to act in a unified fashion … . [ONP] will allow automakers to produce and sell a single fleet nationally, mitigating the additional costs that manufacturers would otherwise face in having to comply with multiple sets of Federal and State standards.

2010 Joint Rule, 75 Fed. Reg. at 25,326. Indeed, one of the Obama Administration's representatives correctly observed that without the ONP,

> there was a significant likelihood that the regulators, acting independently, would produce inconsistent standards with different levels of stringency, along with duplicative or confusing compliance programs and incompatible enforcement policies, which could raise the costs to industry, and compromise the potential benefits of the new standards for consumers and the public.

Jody Freeman, *The Obama Administration's National Auto Policy: Lessons from the "Car Deal,"*

35 Harv. Envtl. L. Rev. 343, 358 (2011).

## IV. The Current Federal Rulemaking Being Challenged Here and California's Withdrawal from the One National Program

20. On August 24, 2018, EPA and NHTSA issued the 2018 NPRM discussed above. Movant-Intervenors' members were actively involved in this midterm evaluation rulemaking process and submitted detailed comments to the record. *See, e.g.*, Global Automakers' Comments on the 2018 NPRM (Oct. 29, 2018), Dkt. No. NHTSA-2018-0067-12032; FCA Comments on the 2018 NPRM (Oct. 26, 2018), Dkt. No. NHTSA-2018-0067-11943; GM Comments on the 2018 NPRM (Oct. 26, 2018), Dkt. No. NHTSA-2018-0067-11858; TMNA Comments on the 2018

NPRM (Oct. 26, 2018), Dkt. No. NHTSA-2018-0067-12150.  In its comments, Global Automakers argued for a final rule that would: (a) continue the significant progress automakers have made in improving fuel economy and reducing GHG emissions; (b) provide automakers with flexible compliance pathways that would incentivize advanced technologies such as battery-electric and fuel cell-electric vehicles; and (c) coordinate with California to ensure the continuation of the One National Program.  *See* Global Automakers' Comments, Dkt. No. NHTSA-2018-0067-12032. Concerning this last point, Global Automakers urged the federal agencies to reach a negotiated outcome that would lead to "a continuation of ONP with California."  *Id.* at A-50.  Similarly, the separate comments from FCA, GM, and TMNA each emphasized the automakers' continued support of the One National Program and of efforts to coordinate with California.  *See* FCA Comments at 7, 10, Dkt. No. NHTSA-2018-0067-11943; GM Comments at 7, 13–14, Dkt. No. NHTSA-2018-0067-11858; TMNA Comments at 27, 32, Dkt. No. NHTSA-2018-0067-12150.

21.     Moreover, the Alliance of Automobile Manufacturers, which includes among its members Coalition members FCA, GM, Mazda, Mitsubishi, and TMNA, provided extensive public comments explaining, among other things, that in the event there is no negotiated outcome, NHTSA has the authority under EPCA to preempt state GHG emission and ZEV standards.  *See* Alliance of Automobile Manufacturers' Comments on the 2018 NPRM at 6–7 (Oct. 29, 2018), Dkt. No. NHTSA-2018-0067-12073.

22.     While the federal rulemaking was pending and discussions between the agencies and California were underway, California preemptively promulgated a rulemaking that effectively withdrew itself from the One National Program.  On November 13, 2018, the California Air Resources Board formally amended its GHG emission regulation to provide that the "deemed-to-comply" provision will no longer apply if the federal standards are amended in any way.  California

has not sought either a waiver or a "within the scope" determination from EPA for its amended regulations, despite the requirement that it do so under Section 209(b) of the Clean Air Act. Consequently, the industry is again faced with the very problem that the Obama Administration recognized and sought to protect the industry from, i.e., "inconsistent standards with different levels of stringency, along with duplicative or confusing compliance programs and incompatible enforcement policies." Freeman, *supra*, at 358.

23.     The ONP Rule was published on September 27, 2019.  In the portion of the rule being challenged in this action, NHTSA reaffirmed its long-held view that "a State or local requirement limiting tailpipe carbon dioxide emissions from automobiles has the direct and substantial effect of regulating fuel consumption and, thus, is 'related to' fuel economy standards." ONP Rule, 84 Fed. Reg. at 51,313.  NHTSA also concluded that "State or local limitations or prohibitions on tailpipe carbon dioxide emissions from automobiles directly conflict with the objectives of EPCA" because "State requirements, made based on State-specific determinations unbound by the considerations in EPCA, frustrate NHTSA's statutory role."  *Id.* at 51,314. NHTSA formalized its position on EPCA preemption by incorporating it in the Code of Federal Regulations.  *See* 49 C.F.R. § 531.7; 49 C.F.R. pt. 531, app. B.

24.     These actions were commenced on September 20 and September 27, 2019, when Plaintiffs filed the instant lawsuits.

## GROUNDS FOR INTERVENTION

25.     Movant-Intervenors are entitled to intervene in these actions as of right under Federal Rule of Civil Procedure 24(a) or, in the alternative, permissively under Rule 24(b).

## I.     Intervention as of Right

26.     Under Rule 24(a)(2), an applicant is entitled to intervene as of right upon establishing: (1) the timeliness of the motion; (2) whether the applicant "claims an interest relating

to the property or transaction which is the subject of the action"; (3) whether "the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest"; and (4) whether "the applicant's interest is adequately represented by existing parties." *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731 (D.C. Cir. 2003) (quoting *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1074 (D.C. Cir. 1998)).

### A.  The Motion Is Timely.

27.  Rule 24(a) requires that motions to intervene be "timely."  The timeliness of a motion to intervene is "to be judged in consideration of all the circumstances."  *Smoke v. Norton*, 252 F.3d 468, 471 (D.C. Cir. 2001).  Timeliness is a "context-specific inquiry"—in evaluating timeliness, courts "take into account: (a) the time elapsed since the inception of the action, (b) the probability of prejudice to those already party to the proceedings, (c) the purpose for which intervention is sought, and (d) the need for intervention as a means for preserving the putative intervenor's rights." *Forest Cty. Potawatomi Cmty. v. United States*, 317 F.R.D. 6, 10 (D.D.C. 2016).

28.  These actions were commenced on September 20 and September 27, 2019, and this motion to intervene is being filed just over one month thereafter.  There is no risk of prejudice to the existing parties, as Movant-Intervenors will not seek any change to the agreed-upon briefing schedule set by the parties regarding Defendants' motion to dismiss or transfer.  In contrast, as articulated herein, it would prejudice the rights of Movant-Intervenors and their members if intervention were denied.

### B.  Movant-Intervenors Claim an Interest Relating to the Property or Transaction Which Is the Subject of These Actions.

29.  As associations representing a substantial portion of the regulated industry under the ONP Rule, Movant-Intervenors and their members will be significantly affected by this Court's

resolution of these challenges.  For example, one of Global Automakers' missions is to advocate sound regulatory policies impacting the automotive industry.  Similarly, one of the Coalition's goals is to protects its members' interest by having a unified national regulatory program to address fuel economy, GHG emissions, and ZEV requirements.  It is incontestable that a multitude of overlapping and inconsistent regulations would frustrate Movant-Intervenors' goals and unnecessarily drive up costs and compliance burdens.  Indeed, that was the underlying rationale of the original One National Program the parties agreed to in 2010.  *See* 2010 Joint Rule, 75 Fed. Reg. at 25,326.

30. Consequently, Movant-Intervenors and their members have a direct and substantial interest in the legal questions at issue in this litigation—i.e., whether California, and states that follow California, can impose on the automotive industry a regulation that acts as a de facto fuel economy standard despite the clear express preemption language in EPCA and despite conflicting regulations at the federal level.  This interest is especially stark given that the burden of complying with such overlapping and conflicting regulations would rest squarely on the industry.

### C. Disposition of These Actions May as a Practical Matter Impair or Impede Movant-Intervenors' Ability to Protect That Interest.

31. The Advisory Committee notes to Rule 24 explain that, "[i]f an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene." Fed. R. Civ. P. 24, advisory committee's note.  Accordingly, the D.C. Circuit has interpreted this requirement "as looking to the 'practical consequences' of denying intervention, even where the possibility of future challenge to the regulation remains available." *Fund for Animals*, 322 F.3d at 735 (alteration omitted) (quoting *Nat. Res. Def. Council v. Costle*, 561 F.2d 904, 909 (D.C. Cir. 1977)).

32.     Here, Plaintiffs' challenge, if successful, would dramatically affect the interests of Movant-Intervenors' members.  Plaintiffs are seeking a determination that, as a matter of law, fuel economy regulations set by the national government under EPCA lack preemptive force.  Such an outcome would directly impair Movant-Intervenors' substantial interests in maintaining strong and achievable fuel economy standards that apply nationwide without any prospect of state-level interference, which, in turn, will impact member operations and design planning.[3]

**D.      Movant-Intervenors' Interests Will Not Be Adequately Represented by Existing Parties in the Lawsuit.**

33.     In adopting the Supreme Court's interpretation of Rule 24's inadequate representation requirement, this Circuit has explained that the burden of showing inadequacy is "minimal," and the applicant need only show that representation of its interests by existing parties "may be" inadequate.  *Id.* at 735 (quoting *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972)).

34.     Neither Plaintiffs nor Defendants adequately represent Movant-Intervenors' interests in this matter.  Defendants are government parties seeking to regulate the GHG emissions and fuel economy of vehicles sold by Movant-Intervenors' members.  Courts routinely find that government parties do not adequately represent the unique interests of private organizations because the government must represent a broader perspective.  *Id.* at 737; *Dimond v. District of Columbia*, 792 F.2d 179, 192–93 (D.C. Cir. 1986).  As associations that represent a substantial portion of the automobile industry, Movant-Intervenors will be able to speak to the impact the

---

[3]      Additionally, it is possible that these actions will ultimately be resolved through negotiations between the litigants, and that a negotiated outcome may result in revisions to the regulatory requirements and/or changes to California's regulatory program.  As discussed above, the original One National Program stemmed in part from a desire to resolve pending litigation concerning whether California has authority to regulate in this space.  Representing a major portion of the regulated industry, Movant-Intervenors' members would not be adequately represented in any such settlement discussions by their regulators.

ONP Rule has on the regulated parties in a manner that neither NHTSA nor the State of California can. This alone is sufficient to find that the government parties will not adequately represent the industry's interests.

35. As intervenors, Movant-Intervenors will contribute to the full and adequate presentation of the important issues involved in these actions and will ensure representation of the interests of those members of the automobile manufacturing industry who would be adversely affected by adjudication in favor of Plaintiffs.

**E.   As Associations Representing a Substantial Portion of the Regulated Industry, Movant-Intervenors Have Standing Under Article III.**

36. In this Circuit, "in addition to establishing its qualification for intervention under Rule 24(a)(2), a party seeking to intervene as of right must demonstrate that it has standing under Article III of the Constitution." *Fund For Animals*, 322 F.3d at 731–32. Standing under Article III requires (1) injury-in-fact, (2) causation, and (3) redressability. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Trade associations such as Movant-Intervenors have "organizational standing" where they can "demonstrate that at least one of their members would otherwise have standing to sue in his or her own right; that the interests they seek to protect are germane to their organizations' purposes; and that neither the claim asserted nor the relief requested requires the participation of individual members." *Air All. Houston v. EPA*, 906 F.3d 1049, 1058 (D.C. Cir. 2018) (quoting *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002)).

37. It is well established that regulated parties or trade associations representing regulated parties have Article III standing in actions challenging agency action or inaction. Indeed, the D.C. Circuit has "generally found a sufficient injury in fact where a party benefits from agency action, the action is then challenged in court, and an unfavorable decision would remove the party's benefit." *Crossroads Grassroots Policy Strategies v. FEC*, 788 F.3d 312, 317 (D.C. Cir. 2015).

15

In keeping with that principle, the Court allowed an agency of the Mongolian government to intervene under Federal Rule of Civil Procedure 24 in a challenge to a decision by the Fish and Wildlife Service under the Endangered Species Act. *Fund for Animals*, 322 F.3d at 733–34. In that case, an environmental group challenged the agency's decision to list argali sheep in Mongolia as a threatened, rather than endangered, species. *Id.* at 730. The Court explained that "Mongolia's sheep are the subject of the disputed regulations, the country benefits from the FWS's current regulations, and Mongolia would suffer concrete injury if the court were to grant the relief the plaintiffs seek." *Id.* at 733.

38.     Here, Movant-Intervenors and their members will be significantly impacted by this Court's resolution of the challenge to the ONP Rule, which provides vehicle manufacturers with the certainty that states cannot interfere with federal fuel economy standards. Regulatory clarity and certainty are critical to the success of Movant-Intervenors' members. Thus, if Plaintiffs were to succeed in challenging the ONP Rule, the manufacturers whom Movant-Intervenors represent would suffer concrete injury. *Cf. Fund for Animals*, 322 F.3d at 733.

39.     Further, Movant-Intervenors' interests in this matter are evidenced by extensive participation in the administrative and litigated events leading to this challenge. As described above, Movant-Intervenors' members have been active participants in prior proceedings regarding preemption, *see, e.g.*, Order Granting Motions to Intervene, *California v. EPA*, No. 18-114 (D.C. Cir. Oct. 18, 2018), and submitted comments in connection with the 2018 NPRM announcing this planned rulemaking.

40.     The final two elements of organizational standing—the germaneness of the litigation and the necessity of member involvement—are likewise easily met. The "requirement of germaneness is 'undemanding'; 'mere pertinence between litigation subject and organizational

purpose' is sufficient." *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 636 (D.C. Cir. 2000) (quoting *Humane Soc'y v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988)).  Movant-Intervenors' duty is to protect its members from inefficient and costly regulation.  *Cf. Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206, 212 (D.C. Cir. 2013).  Given the nature of Plaintiffs' actions, the presence of the Movant-Intervenors' individual members is not required to defend against these suits.  Therefore, Movant-Intervenors have organizational standing in addition to Article III standing.

## II.   Permissive Intervention

41.     The liberal intervention policies underlying Federal Rule of Civil Procedure 24(b) also support Movant-Intervenors' motion.  This rule gives a federal court discretion to allow intervention when the proposed intervenor demonstrates that its "claim or defense … shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b)(1)(B).  For the same reasons stated above, Movant-Intervenors easily meet the substantially less burdensome requirements for permissive intervention.  In addition, this motion is timely and does not prejudice the right of the existing parties.

## CONCLUSION

For the foregoing reasons, Movant-Intervenors respectfully request that this Court grant this motion to intervene in the above-captioned proceedings.

Respectfully submitted,

Dated:    October 31, 2019

/s/ *Raymond B. Ludwiszewski*

RAYMOND B. LUDWISZEWSKI
Bar No. 420540
RACHEL LEVICK CORLEY
Bar No. 1024969
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8500
Fax: (202) 467-0539

*Attorneys for the Coalition for Sustainable Automotive Regulation and the Association of Global Automakers, Inc.*

## CORPORATE DISCLOSURE STATEMENTS
## OF THE COALITION FOR SUSTAINABLE AUTOMOTIVE REGULATION
## AND THE ASSOCIATION OF GLOBAL AUTOMAKERS, INC.

The Coalition for Sustainable Automotive Regulation (the "Coalition"), an unincorporated nonprofit association operating under the laws of the District of Columbia, states pursuant to Federal Rule of Civil Procedure 7.1 that it is not a publicly held corporation, has no parents companies, and no companies have a 10% or greater ownership interest in the Coalition.

The Association of Global Automakers, Inc. ("Global Automakers"), a Virginia not-for-profit corporation, states pursuant to Federal Rule of Civil Procedure 7.1 that it has no parent company and that no publicly held corporation has a 10% or greater ownership interest in Global Automakers.

Respectfully submitted,

Dated:   October 31, 2019

/s/ *Raymond B. Ludwiszewski*

RAYMOND B. LUDWISZEWSKI
Bar No. 420540
RACHEL LEVICK CORLEY
Bar No. 1024969
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8500
Fax: (202) 467-0539

*Attorneys for the Coalition for Sustainable*
*Automotive Regulation and the Association of*
*Global Automakers, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of October, 2019, I served a copy of the foregoing document on all parties through the Court's CM/ECF system.

/s/ *Raymond B. Ludwiszewski*

RAYMOND B. LUDWISZEWSKI
Bar No. 420540
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave. NW
Washington, D.C. 20036
(202) 955-8500
Fax: (202) 467-0539
RLudwiszewski@gibsondunn.com